Central Transportation, Inc., Appellant *v.* Board of Assessment Appeals of Cambria County, Pennsylvania, Appellee.

County of Cambria v. Central Transportation, Inc., Appellant.

Argued November 1, 1978, before President Judge Bowman and Judges Crumlish, Jr., Wilkinson, Jr.,

Mencer, Rogers, Blatt and MacPhail. Judges DiSalle and Craig did not participate.

*Richard T. Williams, Sr.*, with him *William Shettig*, for appellant.

*John W. Taylor* and *Richard Green*, for appellees.

Opinion by Judge Crumlish, Jr., May 24, 1979:

Central Transportation, Inc. (Central) appeals a decision of the Court of Common Pleas of Cambria County which affirmed an interim school tax assessment on Central property and permitted reformation of a lease agreement with the County of Cambria (Cambria) involving the same property.

In 1974 Central agreed to remodel a building which it owned for use by Cambria for a skilled nursing care facility. A lease was prepared by Cambria and executed on March 4, 1975. The lease contained a tax escalation clause which provided that Cambria would be responsible for any real estate tax increase after the "base year," which was defined as being the first tax year in which the building was assessed as sub-

stantially complete. Renovation of the building was ongoing throughout the spring, summer and fall of 1975 with Cambria taking possession of the building on October 21, 1975.

On December 10, 1975, the school district requested an interim school tax assessment on the newly renovated structure. The chief assessor of Cambria County reassessed the property, concluding that the property value escalated from $89,690.00 to $409,340.00.

Central, alleging procedural irregularities, appealed this interim assessment to the Cambria County Board of Assessment Appeals which affirmed. An appeal to the Court of Common Pleas ensued. At this juncture Cambria, as Lessee, filed a suit praying for reformation of the March 4, 1975 lease agreement with Central to include parking which, it contended, was mistakenly omitted from the written agreement.

Both matters were consolidated for hearing and on September 30, 1977, the Honorable GEORGE W. GRIFFITH, S.P. filed his opinion and decree which affirmed the assessment and reformed the lease to include parking subject to agreement on proper consideration. Exceptions were filed by Central and the Common Pleas Court, sitting en banc, dismissed them. By order of President Judge BOWMAN, the cases are consolidated for our review.

Did the Equity Court err in reforming the lease to include parking where the lease agreement made no provisions for parking; indicated that consideration was to be paid in accordance with the property described in the lease; and contained a clause which stated that the written lease contained the entire agreement.[1]

---

[1] We note that extrinsic evidence is admissible for the purpose of showing that by reason of a mutual mistake a written instrument does not truly express the intention of the parties. *McFadden v. American Oil Co.*, 215 Pa. Superior Ct. 44, 257 A.2d 283 (1969).

Central contends the Court did err and argues the record reveals nothing more than an agreement to negotiate parking in futuro, and relies on testimony by its President that the parking question was to be resolved at a future date.

In order to establish mistake in the lease agreement the testimony must be clear, precise and indubitable, and of such weight and directness as to carry conviction to the mind. *Seaboard Radio Broadcasting Corp. v. Yassky,* 176 Pa. Superior Ct. 453, 107 A.2d 618 (1954). The record indicates that parking facilities were discussed between Central representatives and Cambria commissioners at a number of pre-lease commission hearings. The Commissioners testified that at the time the lease was entered into they believed parking was to be included in the lease and were not aware that it was not so included until months after its execution. Plans were displayed by Central's architect prior to the lease agreement which indicated that parking would be available for this skilled nursing care facility. The testimony of record warranted reformation of the lease to include parking, subject to settlement of proper rental, for it clearly revealed the parties intended parking to be included in the lease agreement and mistakenly failed to include it.

Central next reasserts its position that the assessor failed to comply with the applicable assessment law in making the interim school assessment. We agree with the court below that the assessor's action pursuant to Section 677.1[2] was proper and quote at length from Judge GRIFFITH's able opinion:

"IS THE INTERIM ASSESSMENT MADE FOR THE GREATER JOHNSTOWN SCHOOL DISTRICT VALID?

"We think it is.

---

[2] Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §6-677.1.

"On December 10, 1975, the Greater Johnstown School Board requested the Chief Assessor of Cambria County to make an interim assessment of properties in its school district in accordance with the provisions of the Act of 1949, March 10, P.L. 30, Sec. 677.1 as last amended by the Act of 1970, July 22, P.L. 555, Sec. 1, 24 P.S. 6-677.1, which reads as follows:

'Whenever in second, third, and fourth class school districts there is any construction of a building or buildings not otherwise exempt as a dwelling, after September first of any year and such building is not included in the tax duplicate of the school district, the authority responsible for assessments in the city, borough, township, or county shall, upon the request of the board of school directors, direct the assessor in the district to inspect and reassess, subject to the right of appeal and adjustment provided by the Act of Assembly, under which assessments are made, all taxable property in the district to which major improvements have been made after September first and to give notice within 10 days to the authority responsible for assessments, the school district, and the property owner. Such property shall then be added to the duplicate, and shall be taxable for school purposes at the re-assessed valuation for the proportionate part of the fiscal year of the school district remaining after the property was improved. Any improvement made during the month shall be computed as having been made on the first day of the month. A certified copy of the additions or revisions to the duplicate shall be furnished by the board of school directors to the tax collector for the district, and within 10 days thereafter, the tax

collector shall notify the owner of the property of the taxes due the school district.'

"In effect, the Act says that (for school purposes), where there is construction of any building, other than a dwelling, 'after September first of any year' and such building is not included in the school tax duplicate, all taxable property shall be inspected and reassessed; that is, all property to which major improvements shall have been made after September first. This property shall then be included in the duplicate and be taxable for school purposes at the new value for the proportionate part of the fiscal year remaining after the property was improved. The use of the term 'fiscal year' shows that the legislature recognized that school districts operate on a 'fiscal year' which is not coincident with the calender year of the county or the city. Hence the necessitiy for permitting interim assessments for school districts.

"The plain meaning of the language is that when there is construction of a building after September first and the building is not in the tax duplicate, it shall, at the request of the school board, be reassessed and the reassessment would be on 'taxable property to which major improvements shall have been made after September first.' It will be noted that the Act does not say, as contended by the lessor, a reassessment only on the improvements made after September first but reassessment of 'all taxable property.'

"There is a reason, of course, for giving school districts this opportunity of interim assessment which is not required by counties, cities, boroughs, or townships because the school year begins on July 1st and ends on June 30th. In this case, the school district requested an interim assessment on December 10th, 1975, for its fiscal year which began July 1, 1975. The tax duplicate then current was the one prepared by the County based on assessments made before Sep-

tember 1st, 1974. The reason for the Act of 1949, as amended, supra, is that school districts, being on a fiscal year from July 1st to June 30th., were approximately a year behind in assessment changes made on a calendar year basis.

"In this instance, many improvements had been made to the building in question before September 1st, 1975, and many improvements had been made after September 1st, 1975, at the time the interim assessment was requested by the school board in mid-December. We think the language of the Act is clear in directing 'the assessor . . . to inspect and reassess all taxable property . . . to which major improvements have been made after September first. . . .' This is what the assessor did. He assessed lessor's taxable property to which major improvements had been made after September first. We cannot accept the argument that the Act had so narrow a meaning as to make it almost useless; that is, that all the assessor might assess after notice by the School Board are such improvements as have been made after September first, thus omitting all improvements made before September first in any given year.

"From the testimony and the exhibits, it is apparent that at least by late in October, 1975, the improvements were substantially completed. Under these circumstances, since the school's fiscal year runs from July 1st to June 30th, the increase in assessment due to the improvements would be applicable for the period of nine months, beginning October 1st, 1975, and ending June 30th, 1976, which is 'that proportionate part of the fiscal year of the school district remaining after the property was improved.'

"Central interprets Prichard vs. Willistown Twp. Sch. D., 394 Pa. 489, 501, as holding that the interim assessment for school purposes can be effective only for that part of the school year after the interim as-

sessment was made. We do not so understand the holding especially in the face of the clear language of the Act to the contrary i.e. 'after the property was improved.'

"The Prichard case, supra, should be examined more closely. As in our case, so in Prichard, Sec. 677.1 of the School Code providing for an interim assessment on construction of buildings *after September first* of any year was involved. The Supreme Court said that (as here) the time provisions of the 'Fourth to Eighth Class County Assessment Act,' 72 P.S. Sec. 5453.701 could not be complied with because it required certain actions by the Board of Assessment to be taken before September first. The Court found the time provisions in the Assessment Act to be directory and not mandatory and so upheld the interim assessment for school purposes since the taxpayer was given adequate notice and a hearing in conformity with the Assessment Act though necessarily at later dates just as in the present case. We are now faced with the Act of December 14, 1967: P.L. 830, effective January 1, 1969; 72 P.S. Sec. 5453, Sec. 107, which reads as follows:

'All dates specified in this act for the performance of any acts or duties shall be construed to be mandatory and not discretionary with the officials or other persons who are designated by this act to perform such acts or duties.'

"Does the amendment to the Assessment Act, stating that dates for the performance of acts shall be mandatory with the officials who are to perform them, apply to the procedure which the courts have approved in Prichard and other cases for interim school assessment?

"We think it does not.

"When the legislature last amended Sec. 677.1 of the School Code, 24 P.S. 6-677.1 on July 22, 1970, the Act of December 14, 1967, effective January 1, 1969, (making dates mandatory) had been enacted more than two years before. If the mandatory requirement of Sec. 107 of the Assessment Act was to apply to the interim assessments for school purposes, the interim assessment provisions would be automatically rendered inoperative because it applies only to property to which 'major improvements' have been made *after* September first. As we have seen, the Assessment Act required many things to be done *before* September first, thus rendering void all interim school assessments because they apply only after September first.

"Since the statutes are pro tanto irreconcilable, we turn to Consolidated Pennsylvania Statutes, 1 Pa. S. Sec. 1933 which reads:

'Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provision shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail.'

"Sec. 677.1 of the School Code relating to interim school assessments is a 'special' provision and Sec. 107 of the Assessment Act is a 'general' provision within the meaning of Sec. 1933. They are in conflict. The conflict is irreconcilable and the general provision was enacted before and not after the last amendment to the special provision. Even if the gen-

eral provision had been enacted later, it was clearly not the 'manifest' intention of the General Assembly that the general provision should prevail and thus destroy interim school assessments.'' (Emphasis in original.)

Central's final contention is that Cambria is abusing its position as tax assessor and Board of Assessment Appeals for the benefit of Cambria as lessee under the lease agreement. The tax escalation clause in the lease[3] provides in effect that Cambria as lessee is only responsible for the increase in taxes after the

---

[3] ARTICLE IV—Tax Increases

In the event that the real estate taxes payable by Lessor with respect to the land and buildings comprising demised premises shall be increased in any tax year during the term of this lease over the amount of such taxes due and payable for the first tax year, *in which the building shall be assessed as substantially completed* (the applicable tax year being hereinafter referred to as the 'base year') by reason of either an increase in the tax rate or an increase in the assessed valuation (as hereinafter defined) of the levy, assessment, or imposition of any tax on real estate as such not now levied, assessed or imposed (the amount of the increase being hereinafter referred to as 'tax increase') Lessee shall pay to Lessor as additional rent, within thirty (30) days after each such tax or installment thereof shall be due and payable to Lessor, an amount equal to the tax increase multiplied by a fraction of which the numerator shall be the floor area of the demised premises and the denominator of which shall be the floor area of all floors in the building at the time such tax or installment shall become due and payable.

For the purpose of this Article, 'assessed valuation' shall mean initially the valuation for taxation made by the county or municipal officer or body exercising the function of tax assessor for the base year of the buildings erected thereon. If, during or after the base year, Lessor shall improve any other portion of the building erected on said land then the valuation for taxation for any such improvements for each tax year thereafter shall be excluded in determining the assessed value. (Emphasis added.)

property is assessed as substantially complete. The contention is that by delaying City and County tax assessments Cambria is able to delay the base year (*i.e.,* the year in which the property is assessed as substantially complete) and thus avoid taxes.

The problem with this argument is that the court below determined on the basis of substantial evidence that the building was not "substantially complete" until after September 1, 1975. Thus, no one had a duty to assess prior to that period. When requested by the school district, the Cambria tax assessor re-assessed the property. Thus, in the state of the present record, assuming there was an implied contractual duty on the part of Cambria to assess the building, there could be no violation.

Accordingly, we

ORDER

AND Now, this 24th day of May, 1979, the decree of the Court of Common Pleas of Cambria County entered September 30, 1977, is affirmed.

CONCURRING AND DISSENTING OPINION BY PRESIDENT JUDGE BOWMAN:

I concur in the majority opinion affirming the order of the lower court with respect to the tax assessment appeal. I respectfully dissent from the majority opinion in affirming the lower court's equity decree reforming the written lease agreement to include a parking area adjacent to the leased premises as being a part of the leased premises on the theory of mutual mistake of fact. In my opinion, the evidence of a mutual mistake of fact falls short of the "very clear proof," *Ridgway's Account*, 206 Pa. 587, 56 A. 25 (1903), or the "clear, precise and convincing evidence," *Scott v. Bryn Mawr Arms*, 454 Pa. 304, 312 A.2d 592 (1973), required to support the reformation

of a written instrument complete on its face, and particularly so, when, as here, the one seeking to reform the lease agreement was the scrivener of the originally executed lease agreement of November 12, 1974, and the revised lease agreement of March 6, 1975. Neither agreement mentioned or in any way alluded to the parking lot. To the contrary, the demised premises are particularly described and the rental consideration set forth is a monthly sum calculated on the term of the lease at a square foot rate multiplied by the square footage of the floor area described as the leased premises.

Contrary to the majority, I can find no mutuality of mistake of fact from the minutes of lessee county commissioners' meetings with representatives of the lessor in which the subject of the *use* of the adjacent parking lot was discussed but clearly not in the context of being within or a part of the leased premises. It is equally clear that these minutes disclose no mutuality as to the right of lessee to use this parking lot without cost or at a determined cost or, for that matter, a mutuality as to the right of lessee to use the parking lot at a consideration to be thereafter determined. Testimony of several county commissioners as to what they individually understood to be the "agreement" as to the use by the lessee county of the parking lot discloses only a want of mutuality as among the commissioners themselves. In short, the evidence adduced to support mutuality of mistake of fact is not only far short of the proof required, but convinces me that no understanding whatsoever existed with respect to the parking lot.

The lower court reformed the lease agreement to "include in said lease all of Central's land adjacent to the premises leased to the County at a fair monthly rental to be agreed upon by the parties or if agreement is not possible, then . . . after hearing . . ." whereup-

on the lower court will apparently fix a fair monthly rental.

As the lessee county does not lease the entire building in question which is also tenanted by another tenant, such a conclusion is untenable and is without any supporting evidence in the record even if one assumes that there is clear, precise and convincing evidence of record that there was a mutual mistake of fact in not including in the written lease an understanding that lessee truly would have *some use* of the parking lot for a consideration to be agreed upon in the future.

I would reverse the lower court and dismiss the complaint in equity as to this issue.

Judges MENCER and MACPHAIL join in this concurring and dissenting opinion.