417 A.2d 144

**CENTRAL TRANSPORTATION, INC., Appellant,**

v.

**BOARD OF ASSESSMENT APPEALS OF CAMBRIA COUNTY, Pennsylvania, Appellee.**

**COUNTY OF CAMBRIA, Appellee,**

v.

**CENTRAL TRANSPORTATION, INC., Appellant.**

Supreme Court of Pennsylvania.

Argued March 3, 1980.

Decided July 3, 1980.

488

490

Richard T. Williams, Sr., Windber, for appellant.

John W. Taylor, Ebensburg, Richard J. Green, Jr., Johnstown, for appellees.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY, and KAUFFMAN, JJ.

## OPINION OF THE COURT

KAUFFMAN, Justice.

This is an appeal by Central Transportation, Inc. (hereinafter "Central"), from an order of the Commonwealth Court affirming a decree of the Court of Common Pleas of Cambria County which: (1) reformed a lease agreement between Central and appellee, Cambria County (hereinafter "County"), and (2) upheld an interim school tax assessment on Central property. For the reasons set forth below, we vacate the order of the Commonwealth Court and remand the matter to the Court of Common Pleas.

In 1974, Central agreed to remodel the top floor of a building it owned in Johnstown, Pennsylvania for the operation by County of a "skilled nursing care center." An initial lease agreement between the parties, executed on November 12, 1974, provided that County would lease the remodeled premises for a ten year term at an annual rental, predicated on estimated construction costs, of eight dollars and twenty-five cents per square foot. The lease also provided that

County would be responsible for all real estate taxes occasioned by the construction.

When the construction bids exceeded the estimated cost, the parties renegotiated their agreement, and on March 6, 1975, executed a second lease prepared by County, providing for a thirteen year term at the same square foot rental.[1] The lease also included a tax escalation clause providing that County would be responsible for any real estate tax increase after the "base year," which was defined as the first tax year in which the building was assessed as "substantially completed."[2] The parties expressly stipulated that the lease

1. With respect to the area to be leased, the agreement specifically provided:

   Article I—Demised Premises

   The Lessor [Central] hereby leases to the Lessee [County] and Lessee hereby rents from Lessor *the following described premises,* herein called "Demised Premises," situated in the Eighth Ward of the City of Johnstown, County of Cambria and State of Pennsylvania:

   The top floor of the building located at 1017 Franklin Street, together with storage area and access areas to said building and *containing 21,250 square feet.* (Emphasis supplied).

2. The lease provided:

   Article IV—Tax Increases

   In the event that the real estate taxes payable by Lessor with respect to the land and buildings comprising the demised premises shall be increased in any tax year during the term of this lease over the amount of such taxes due and payable for the first tax year, in which the building shall be assessed as *substantially completed* (the applicable tax year being hereinafter referred to as the "base year") by reason of either an increase in the tax rate or an increase in the assessed valuation (as hereinafter defined) of the levy, assessment or imposition of any tax on real estate as such not now levied, assessed or imposed (the amount of the increase being hereinafter referred to as "tax increase") Lessee shall pay to Lessor as additional rent, within thirty (30) days after each such tax or installment thereof shall be due and payable to Lessor, an amount equal to the tax increase multiplied by a fraction of which the numerator shall be the floor area of the demised premises and the denominator of which shall be the floor area of all floors in the building at the time such tax or installment shall become due and payable.

   For the purpose of this Article, "assessed valuation" shall mean initially the valuation for taxation made by the county or municipal officer or body exercising the function of tax assessor for the base year of the buildings erected thereon. If, during or after the base year, Lessor shall improve any other portion of the building erected

contained their entire agreement, that no dealings or custom would be permitted to contradict or modify its terms, and that any modification must be reduced to writing and signed by the parties.

Renovation of the building proceeded during the spring, summer and fall of 1975. In September, 1975, employees of County began setting up beds and furniture in the building, and County took possession on October 21, 1975.

On December 10, 1975, the School District of the City of Johnstown (hereinafter "School District"), pursuant to Article VI, Section 677.1 of the Public School Code of 1949, 24 P.S. § 6–677.1 (hereinafter "Section 6–677.1"), requested an interim assessment on the renovated structure for school tax purposes. On January 14, 1976, County reassessed the property and increased the valuation from $89,690.00 to $409,-340.00. Central appealed this interim school tax assessment to appellee, Board of Assessment Appeals of Cambria County (hereinafter "County Board"), which affirmed the interim assessment on June 2, 1976.[3] On July 6, 1976, Central appealed this decision of the County Board to the Court of Common Pleas of Cambria County.

Shortly thereafter, County filed a separate action in equity praying for reformation of its lease with Central to include as part of the leased premises the adjacent parking area, allegedly omitted by mistake. In this second action, Central filed a counterclaim seeking to enjoin County from further use of the parking lot and to require payment for its use to date.

on said land then the valuation for taxation for any such improvement for each tax year thereafter shall be excluded in determining the assessed value.
(Emphasis supplied).

3. Although County had not reassessed the property prior to September 1, 1975, the chief assessor immediately certified the interim school district assessment of $409,340.00 to all taxing districts for their use during 1976. Upon receiving tax bills from all taxing districts for 1976 based on this new assessment, Central again appealed to the County Board. This appeal is still pending.

On September 30, 1977, after consolidation of the two actions, the trial court reformed the lease to include the *entire* parking area, and upheld the validity of the interim school district assessment. Jurisdiction was retained to determine the rental for the parking area if the parties could not agree. Central's exceptions to the decree were dismissed by the court *en banc* on January 4, 1978.

On May 24, 1979, after hearing consolidated appeals from the decisions in both cases, the Commonwealth Court affirmed the decree of the Court of Common Pleas. *Central Trans. v. Board of Assessment Appeals*, 43 Pa.Cmwlth. 49, 401 A.2d 857 (1979). This appeal followed.[4]

## I.  REFORMATION OF THE CONTRACT

Proceeding under the theory of mutual mistake of fact, the Court of Common Pleas reformed the lease to include *all* "of Central's land adjacent to the premises leased to the County at a fair monthly rental to be agreed upon by the parties or if agreement is not possible, then  .  .  .  after [a] hearing  .  .  . " at a fair monthly rental to be determined by the court. Because County's evidence of mutual mistake of fact falls far short of the "very clear proof," *Ridgway's Account*, 206 Pa. 587, 590, 56 A. 25, 26 (1903), and "clear, precise and convincing evidence," *Scott v. Bryn Mawr Arms*, 454 Pa. 304, 308–09, 312 A.2d 592, 595 (1973), required to support reformation of a writing complete on its face, we reverse.

In reforming the lease here, a writing drafted by the party seeking reformation and complete on its face, the lower court relied upon the minutes of several meetings of the County Commissioners with the principals of Central and upon the testimony of two former County Commissioners.[5] This evidence, however, is clearly insufficient to support reformation. The minutes of the County Commission-

4.  Jurisdiction is vested in this Court pursuant to the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, § 2, 42 Pa. C.S.A. § 724(a) (Purdon Pamph. 1979).

5.  Central initially contends that since the lease is complete on its face and prohibits modifications or additions unless reduced to writing

ers' meetings make reference only to discussions about the availability of parking space, "for 40 cars," "for about 40 cars," and "for 30 cars," and do not clearly, precisely and convincingly prove that the parties agreed to include any portion of the parking area as part of the leased premises.[6] Similarly, the testimony of the former County Commissioners as to what they individually understood to be the "agreement" of the parties regarding the parking area fails to establish an agreement on this issue.[7] *See Easton v. Washington Insurance Co.*, 391 Pa. 28, 37, 137 A.2d 332, 337 (1957).

■■■ The lease itself provides further support for the conclusion that reformation is inappropriate: (1) Both the

and signed by the parties, the evidence relied upon by the trial court was inadmissible under the parol evidence rule. We disagree. Extrinsic evidence is generally admissible for the purpose of showing that by reason of a mutual mistake, a written instrument does not truly express the intention of the parties. *Evans v. Marks*, 421 Pa. 146, 153–54, 218 A.2d 802, 805–06 (1966); *Bugen v. New York Life Insurance Co.*, 408 Pa. 472, 475, 184 A.2d 499, 500 (1962); *Roberts v. Roesch*, 306 Pa. 435, 439, 159 A. 870, 871 (1932). Denial by one of the parties that a mistake was made does not in itself prevent a finding of mutual mistake. *Bollinger v. Central Pennsylvania Quarry Stripping and Construction Co.*, 425 Pa. 430, 432, 229 A.2d 741, 742 (1967).

**6.** Since County was not the sole tenant of the building in question, the trial court's award of the *entire* parking area to County without any record support of Central's intention to deprive its other tenant of *any* parking space is in direct conflict with the testimony of former Commissioner Johnson, *see* note 7 *infra*, and is manifestly erroneous.

**7.** Former Commissioner Gorman testified that he "thought" the parking area "went with the structure," and that in September, 1975, he first learned that the parking area was not mentioned in the lease. Mr. Gorman also stated that Central's architect showed him a drawing depicting approximately 60 parking spaces which he understood were to go with the lease to County, and that there was no mention of any additional payment by County.

Former Commissioner Johnson testified that because the floor beneath the premises leased by County was occupied by another tenant, the latter was to be entitled to use some of the parking spaces and County was to have the remainder. He also testified that at the time of the execution of the lease, he thought the lease included the parking spaces.

Central's president testified in rebuttal that the first time the question about parking space being included in the lease arose was in the fall of 1975, approximately six months after the lease was signed.

November 12, 1974 and March 6, 1975 versions of the lease are silent on parking facilities; the description of the demised premises in the final document *drafted by the County* refers only to the square footage of the building.[8] (2) The rental provided in the lease was based upon the square footage of the floor area of the building described as the leased premises. If the parking area were intended to have been included, provision would have been made for additional rental based upon that square footage.[9] (3) The lease, by its terms, represents the entire agreement and expressly prohibits modifications or additions unless reduced to writing and signed by the parties. (4) County, the proponent of reformation, was itself the scrivener of the lease, and it is well settled that a written agreement will be construed against the party preparing it. *Burns Manufacturing Co. v. Boehm*, 467 Pa. 307, 313 n.3, 356 A.2d 763, 766 n.3 (1976); *Baltic Development Co. v. Jiffy Enterprises*, 435 Pa. 411, 416, 257 A.2d 541, 543 (1969).

■ A careful review of the record discloses that when the March 6, 1975 lease was executed, County and Central were discussing the availability of parking, but no agreement had been reached. At most, it was contemplated that the parties would negotiate in the future in an effort to reach agreement on material terms, such as the number of parking spaces that would be made available to County and the

8. *See* note 1 *supra.*

9. County argues that it was the intention of the parties to include the parking lot within the terms of the lease at no additional cost to County. *See* note 6 *supra.* That claim, however, was rejected even by the trial court, which concluded that while the parties intended to include the parking area in the lease, the amount of the additional rental remained to be agreed upon:

From the record in this case we find that there is not clear, precise and convincing evidence which would permit us to reform this lease of March 6, 1975, to the extent of adding thereto a clause that the parking lot of Central is to be utilized for the term of the lease by the County with no compensation.

consideration to be paid therefor.[10] The omission from the lease of any reference to an agreement on parking was not by reason of mutual mistake of fact, but rather because agreement had not yet been reached. Accordingly, the order of the Commonwealth Court affirming reformation of the lease dated March 6, 1975 is vacated, and the matter is remanded to the Court of Common Pleas for the entry of an order enjoining County from further use of Central's parking lot and fixing an appropriate amount to be paid for any use thereof to date.

## II. THE INTERIM TAX ASSESSMENT

Central's property was valued at $89,690.00 in the assessment roll which closed on September 1, 1975. Although major improvements had been made prior to September 1, 1975, this assessment was not appealed by any party within the time allowed by 72 P.S. § 5453.701. Instead, on December 10, 1975 the School District requested an interim assessment of the property for school tax purposes. Thereafter, the property was reassessed, resulting in an increase in valuation to $409,340.00. This reassessment was performed pursuant to the provisions of 24 P.S. § 6–677.1:

> Whenever in second, third, or fourth class school districts there is any construction of a building or buildings not otherwise exempt as a dwelling, after September first of any year and such building is not included in the tax duplicate of the school district, the authority responsible for assessments in the city, borough, township, or county shall, upon the request of the board of school directors, direct the assessor in the district to *inspect and reassess,* subject to the right of appeal and adjustment provided by the Act of Assembly, under which assessments are made, *all taxable property in the district to which major improvements have been made after September first* and to give notice within ten days to the authority responsible for assessments, the school district, and the property own-

10. There was disagreement even among the former County Commissioners about the terms of the parking "agreement" they now allege was omitted from the lease by mutual mistake.

er. Such property shall then be added to the duplicate, and shall be taxable *for school purposes* at the reassessment valuation *for the proportionate part of the fiscal year of the school district remaining after the property was improved.* Any improvements made during the month shall be computed as having been made on the first day of the month. A certified copy of the additions or revisions to the duplicate shall be furnished by the board of school directors to the tax collector for the district, and within ten days thereafter, the tax collector shall notify the owner of the property of the taxes due the school district. (Emphasis added).

Relying on the reasoning of the Court of Common Pleas, the Commonwealth Court held the interim assessment valid for school tax purposes. *Central Trans. v. Board of Assessment Appeals, supra,* 43 Pa.Cmwlth. at 52–58, 401 A.2d at 859–862.[11]

■ On appeal, Central argues that an interim assessment performed pursuant to Section 6–677.1 is valid only with respect to those major improvements made after September 1 and cannot be employed as a means for reassessing major improvements made prior thereto. Central submits that County waived its rights by not appealing the original assessment before September 1, and may not now use the interim assessment procedure as an alternative method of correcting assessing errors.[12]

11. Because a school district's fiscal year normally begins on July 1, 24 P.S. § 6–671, the legislature recognized that if construction of an improvement were delayed until after September 1, the improvement would not be reassessed until the next fall, and the school district would not receive the benefit of the increased assessment until as much as twenty-two months after construction. *See Prichard v. Williston Township School District,* 394 Pa. 489, 502, 147 A.2d 380, 388 (1959).

12. Central also argues that the entire interim assessment is void because of County's failure to comply with the notice provision of Section 6–677.1. The reappraisal of the property was made on January 14, 1976, while notice of the change in assessment was not mailed until February 17, 1976. Section 6–677.1 requires the assessor "to give notice of such reassessment within ten days to the authority responsible for assessment, the school district and the

■ The plain meaning of Section 6–677.1 is that upon request of the school district, *all* taxable property to which major improvements have been made *after* September first, shall be inspected and *reassessed.* This property shall then be included in the duplicate and be taxable *for school purposes* at the new value for the proportionate part of the fiscal year remaining after the property was improved.[13] By its terms, Section 6–677.1, does not limit the reassessment to only those improvements made after September 1, as contended by Central, but rather mandates *reassessment* of *"all* taxable property in the district to which major improvements have been made" after that date. (Emphasis supplied).

■ For present purposes, the critical provision of Section 6–677.1 is that which directs the assessor to "inspect and *reassess . . . all* taxable property in the district to which *major* improvements have been made *after* September first . . ." (Emphasis supplied). Despite the dispositive importance of the September first date and the nature of any improvements made thereafter, the trial court found only that "many improvements had been made to the building in question before September 1st, 1975, and many im-

property owner." While Central is correct in alleging non-compliance with the notice requirement, the conclusion that failure to notify a property owner of the change in assessment within the prescribed time period automatically voids the entire interim assessment does not necessarily follow. Here, Central does not allege, nor does it appear, that Central was in any way prejudiced by the delay; Central was able to appeal the reassessment to the County Board and suffered no penalty because of the delay. Under these circumstances, we will not declare the interim assessment void because of an insignificant delay of notice. *See Taylor Borough Appeal,* 408 Pa. 56, 182 A.2d 754 (1962).

13. Obviously, Section 6–677.1 must be construed as an exception to the general mandatory requirements of Section 107 of the Assessment Act, which provides that:

All dates specified in this Act for the performance of any acts or duties shall be construed to be mandatory and not discretionary with the official as other persons who are designated by this Act to perform such acts or duties.

72 P.S. § 5453.107. Otherwise, we would be faced with the absurd result that all interim assessments would be void because, by definition, they must be performed after September first of any year.

provements had been made after September 1st, 1975. . ."
The trial court did not find, nor are we able to determine
from the record before us, whether any *major* improvements
were made to the building in question *after* September 1,
1975. It is therefore necessary to vacate the order of the
Commonwealth Court and remand this action to the trial
court for a specific finding on this critical factual issue.

If no *major* improvements were made after September 1, 1975, then, by the express terms of the statute, the
interim assessment procedure of Section 6–677.1 would be
inapplicable, and the interim assessment here complained of
would be void.[14] If, however, *any* major improvement was
made after September 1, 1975, the interim assessment proce-
dure would be applicable, and *all* taxable property to which
such improvement was made would be subject to *reassess-
ment* for *school* purposes.[15]

## III. THE ESTABLISHMENT OF THE BASE YEAR

As noted earlier, the lease agreement between Cen-
tral and County included a tax escalation clause providing

**14.** *See Johnstown Industries Development Corp. v. Jerome*, 3 D. &
C.3d 52 (1977), wherein the Court of Common Pleas of Cambria
County held that where there had been no major improvement of a
property subsequent to September 1 of the taxable year, a reassess-
ment for earlier improvements under the purported authority of
Section 6–677.1 was void.

**15.** Central also contends that the action of the chief assessor in
certifying to all taxing districts the interim school assessment valua-
tion for the purpose of setting assessed valuation for 1976 general
tax purposes is invalid. Central argues that the interim assessment
procedure of Section 6–677.1 is intended for school purposes only
and, therefore, the assessor cannot attempt to utilize the interim
school assessment for the purpose of fixing assessed valuation for
other taxing entities. We agree. The statute, by its clear language,
applies only to a building "not included in the tax duplicate *of the
school district*" and provides that "such property shall be added to
the duplicate, and shall be taxable *for school purposes* at the reas-
sessed valuation." (Emphasis supplied). Indeed, County concedes
at page 17 of its Brief that Section 6–677.1 was not intended to be
utilized to alter assessed valuation for other purposes:

. . . [T]he city and county could not levy and assess taxes on
the reassessed value of Central's property until the calender year
1977.

that County would be responsible for any real estate tax increase measured from the "base year." [16] The lease clearly imposes upon County the obligation to assess the building as soon as it was "substantially completed." [17]

Both Central and County presented evidence as to when the renovations were substantially completed. It appears that although legal occupancy of the premises did not occur until October 21, 1975, the renovation of the premises may have been "substantially completed" by August 1, 1975. At that time, the work remaining appears to have been of a minor nature; the work was so far completed that County's employees began setting up beds and furniture in September, 1975. Nevertheless, the trial court found only that "*at least by* late October, 1975, the improvements were substantially completed," (emphasis supplied), but made no finding as to the date on which the renovations were in fact "substantially completed." Because the assessment rolls for the 1976 tax year closed on September 1, 1975, a finding of this nature is necessary for resolution of the base year issue. Accordingly, the action is remanded to the Court of Common Pleas for a factual determination of when County first could have assessed the building as "substantially completed."

## IV. CONCLUSION

The order of the Commonwealth Court is vacated and remanded for proceedings consistent with this opinion.

16. "Base year" was defined as being the first tax year in which the building was assessed as "substantially completed." *See* note 2 *supra.*

17. Otherwise, Central would be prejudiced in several ways. For example, by failing promptly to assess the property, County, which also acted as the assessor and the Board of Assessment Appeals, could delay the establishment of the "base year," and thereby avoid its obligation under the tax escalation clause for at least one year. Moreover, by delaying the tax "base year," Central's tax burden would be increased and County's decreased.