## Adobe Oil & Gas Corp. v. Harchick

*Michael S. Delaney,* for plaintiff.
*Suzanne M. Powlouski,* for defendants.

REILLY, *P.J.,* February 27, 1984 — Plaintiff Adobe Oil and Gas Corporation (hereinafter "Adobe") brings this action for declaratory judgment under the Declaratory Judgments Act* to determine the rights and obligations of the parties under a certain oil and gas lease executed in 1981 and specifically to interpret a particular paragraph therein.

On February 2, 1981, Kenneth J. Harchick and Joyce A. Harchick, the defendants, leased their 150-acre tract of land in Burnside Township, Clearfield County, to C.O.G. Energy Services, Inc., for the purpose of oil and gas production. C.O.G. then assigned the lease to Adobe.

Paragraph 1 of the lease provides that "this lease shall remain in force for a primary term of two years from the effective date hereof and as long thereafter as the said land is operated by Lessee in the production of oil or gas."

---

*July 9, 1976, P.L. 586, No. 142, §2 42 Pa. C.S.A. §7531 et seq.

Paragraph 20, the provision in dispute, which was added at the end of the lease, provides:

"This lease to consist of a three well drilling program. First well to be drilled within the term of this lease. The remaining wells to be drilled at the rate of one per year beginning one year from the end of the primary term of the lease. If this drilling program is not followed, each completed well will retain the oil and gas rights only 1200 feet around it and the balance of the property will be removed from the lease."

Adobe drilled and completed three gas wells on the lessors' premises during the primary term of the lease. It now desires to drill a fourth well. The lessors assert that, by completing three gas wells within the primary term of the lease, Adobe did not follow the drilling program set forth in Paragraph 20. Therefore, they contend, each completed well retains only gas and oil rights for 1200 feet around it, with the balance of the property being removed from the lease. We disagree.

In construing the lease, the intention of the parties must be ascertained. Woytek v. Benjamin Coal Company, 300 Pa. Super. 397, 446 A.2d 914 (1982). In order to determine that intention, "the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement." International Organization Master, Mates and Pilots of America, Local No. 2 v. International Organization Masters, Mates and Pilots of America, Inc., 497 Pa. 102, 109, 439 A.2d 621 (1981). The lease must also be construed with regard to the known characteristics of the business, which, in this case, includes the presumption that an oil and gas lease is made for immediate development unless the contrary appears in the con-

tract. Burgan. v. South Penn Oil Co., 243 Pa. 128, 89 A. 323 (1914); 24 P.L.E., Mining; Oil and Gas § 71.

It is apparent that the language of Paragraph 20 was intended to provide the maximum period of time within which the prescribed number of wells were to be drilled, not the minimum. The language of the lease and Mr. Harchick's testimony both indicate that the lease was executed for the sole purpose of developing the land for production of gas and oil. At the hearing on December 22, 1983, Mr. Harchick testified that he wanted to make as much money as he could from the oil and gas underlying his property, that he wanted as many gas wells on his property as possible, and that he wanted his entire 150-acre tract developed.

To construe Paragraph 20 as prohibiting Adobe from drilling a second well until one year after the end of the primary term and a third well until one year after that is somewhat inconsistent with both the express purpose of the lease and the Harchicks' intent to have their property fully developed for gas production. Our view of Paragraph 20, on the other hand, more accurately reflects the intent of the parties at the time the lease was executed, is consistent with all other provisions of the lease, and comports with the customary purpose of such provisions in leases of this nature, namely to establish, for the benefit of the lessors, the deadlines for completion of the wells. See 24 P.L.E., Mining; Oil and Gas § 71 et seq. In fact, we have yet to encounter, in the course of our research or otherwise, such a provision in an oil and gas lease which was included for any purpose other than to compel the prompt development of the leasehold.

As our Supreme Court stated in Western Penna. Gas Co. v. George, 161 Pa. 47, 52, 28 A. 1004 (1894):

"A provision obviously designed to hasten the development of the property should not be allowed to prevent such development, if it admits of a construction which harmonizes with the other provisions of the agreement and gives effect to the controlling intention of the parties to it." Paragraph 20 was clearly intended to encourage the prompt development of the lessors' premises and was included in the agreement at the lessors' behest, and for their benefit.

Under the circumstances, we find that the lease was not breached by Adobe's completion of three wells within the primary term. Rather, the lease is in full force and effect in accordance with Paragraph 1 thereof, quoted above.

The question remains, however, whether Paragraph 20 of the lease limits Adobe to the drilling of only three wells on the property, as the lessors suggest.

The lease provides, in a typical printed form, "(t)hat said Lessor, in consideration of the sum of ONE DOLLAR ($1.00), the receipt of which is hereby acknowledged, and of the covenants hereinafter contained on the part of said Lessee, to be paid, kept and performed, has granted, demised, leased and let, *exclusively* unto Lessee, . . . for the purpose and with the rights of drilling, producing, and otherwise operating for oil and gas, and of laying pipe lines and building tanks, roads, . . . with all other rights and privileges necessary, incident to or convenient for the operation of this land alone and cojointly with neighboring lands, all that certain tract of land situate in the Township of Burnside . . . and containing . . . one hundred and fifty acres of land . . ., it being the intent of Lessor to include all lands owned by the Lessor in said county." (Emphasis added).

By this language, the agreement grants to the lessee the exclusive right to the oil and gas in the lessors' entire 150-acre tract. This is more than a mere license granting the lessee the right to remove the oil and gas because the lessors are prohibited, by the terms of the agreement, from removing the oil or gas themselves and from allowing anyone else to do so. The lease creates a corporeal interest in the gas and oil themselves in the Lessee. See The Pennsylvania Bank and Trust Company v. Dickey, 232 Pa. Super. 224, 335 A.2d 483 (1974). Further, Paragraph 1 states that the lease shall remain in force for a period of two years and for so long thereafter as the land is operated by the lessee in the production of oil or gas. Accordingly, since Adobe commenced operations within the initial two-year period of the lease, its exclusive interest in the oil and gas will continue until such time as Adobe ceases operations on the premises.

However, the first sentence of Paragraph 20 provides, "This lease to consist of a three well drilling program." Its meaning seems sufficiently clear when read by itself. But its exact meaning is not altogether clear when it is read within the context of the entire agreement. If it provides for the minimum number of wells to be drilled, there is no inconsistency between Paragraph 20 and the other provisions of the lease. But if it specifies the maximum number of wells, then Adobe would lose its interest in the oil and gas when the three existing wells are no longer productive because Adobe would not be allowed to drill any additional wells regardless of whether such additional wells would produce gas in paying quantities. Adobe's interest would not be so limited if the provision in question did not appear in the lease. In the absence of Paragraph 20, Adobe would have not only the right but the duty to

drill as many wells as reasonably necessary to fully develop the leasehold in the production of gas or oil. The record indicates that this could entail the drilling of at least six or seven wells. Therefore, the sentence in question must be construed to determine whether it was intended to prescribe the minimum number of wells to be drilled or the maximum number of wells.

We are guided by the following principles of construction:

"In interpreting contracts the intention of the parties must be determined. In a written contract the intent of the parties is manifested by the writing, and when the words are clear and unambiguous the intent is to be determined from the express language of the agreement. Further, a contract must be interpreted as a whole and effect must be given to all its provisions." Woytek v. Benjamin Coal Company, 300 Pa. Super. 397, 402-03, 446 A.2d 914 (1982).

Additionally, we note the following:

" 'Where written and printed portions of a contract are repugnant, printed matter must yield to written clauses, as written clauses presumably constitute deliberate expression of the real intent of the parties.' " Id. at 403.

And finally, a written agreement will be construed against the party preparing it. Central Transportation, Inc. v. Board of Assessment Appeals of Cambria County, 490 Pa. 486, 417 A.2d 144 (1980).

Applying these principles to the instant case, we are compelled to find that the first sentence of Paragraph 20 was intended to mean precisely what it says. Specifically, there are to be three gas wells completed on the premises, no less and no more.

We observe that Paragraph 20 was a typewritten addition to the lease. As such, to the extent that its

provisions are inconsistent with any printed provisions of the lease, the language of Paragraph 20 will prevail. And although the record indicates that the lessors were responsible for the inclusion of Paragraph 20, the lease was in fact drafted by the lessee and, accordingly, it will be construed against Adobe.

Further, the testimony taken at the hearing sheds little light on the true intent of the parties regarding the provision in controversy. Mr. Harchick was the only witness to testify. His testimony was self-contradictory throughout. It is clear that he wanted as many gas wells on his property as possible and that he wanted his entire premises developed for gas production. But he also testified that he believed the lease called for three wells only and that he did not expect any more. Almost immediately thereafter, however, he indicated that the purpose of Paragraph 20 was to see that his total 150-acre tract was completely developed. This comported with earlier testimony regarding the purpose of the lease and Mr. Harchick's understanding thereof. The following is some of that testimony:

"(BY PLAINTIFF'S COUNSEL):

Q. Okay. Did you at that time care how many gas wells were on your well — on your land?. . . .

A. Yes. I guess I did care.

Q. All right. And why did you care?

A. Well, for monetary reasons.

Q. So, you wanted gas wells in order to receive more money. You were interested in making as much money from the oil and gas underlying your property as you could, is that right?

A. Yes.

Q. And this is important, Mr. Harchick, you wanted at least three gas wells on your premises, is that right?

A. Yes.

Q. If Adobe Oil & Gas Corporation or the land man said: Is it all right if we drilled four gas wells or six, would you have cared as long as there were at least three, yes or no, at that time? If they would have guaranteed you six gas wells, would you have been satisfied?

A. Probably."

This testimony tends to indicate that Paragraph 20 was intended to provide for a minimum of three wells. Yet later, in a further attempt to explain the meaning of Paragraph 20, Mr. Harchick testified as follows:

"(BY PLAINTIFF'S COUNSEL):

Q. Do you want to explain your answer?

. . . .

A. . . .Mr. Shaulis came along and said: Well, since my farm is big enough for six or seven gas wells or more, that Adobe . . . would put in three wells, which was one eighth royalty and lease money. Some other landowners were saying they were going to get three sixteenths and they were getting fifteen dollars an acre lease money.

Q. So was that back in 1981?

A. Yes sir. So, I thought by limiting myself to three wells that way . . . in the event I would get an unsatisfactory company, I could then go ahead and I'd have room for possibly three or four more wells under much better monetary terms for myself.

. . . .

Q. And are you saying you only wanted three wells from Adobe because there were other companies at the time offering more money than Adobe was?

A. Yes.

Q. But you didn't bother looking for them?

A. My lease had ran out, I believe, in January, and I was interested in signing up with another company, a new lease."

When Mr. Harchick was last questioned by his own counsel, he again testified that he believed he was agreeing to *only* three wells when he signed the lease.

The testimony indicates that, while the Harchicks wanted their property fully developed, they may not have wanted it so developed under the particular lease in question, hoping instead for another lease at some future date with a company offering more favorable terms. This is purportedly the reason behind the inclusion of a provision specifying three wells. It is more likely, however, that the Harchicks wanted to be guaranteed a minimum of three wells under the lease. But that is not what Paragraph 20 states, and we cannot ignore the plain meaning of those words in dispute. Steuart v. McChesney, 498 Pa. 45, 444 A.2d 659 (1982).

In Stoddard v. Emery, 128 Pa. 436, 442, 18 A. 339 (1889), the Supreme Court held:

"The parties provided by the express terms of their contract how many wells should be put down, and that provision of the contract determines the question. When the number is expressed, there is no room for any implication that there should be some other number. Had there been nothing said in the contract on the subject, there would of course have arisen an implication that the property should be developed reasonably. . . . But that doctrine has no application in a case where the parties have expressly agreed in the contract how many wells should be bored."

In that case, it was the lessor who desired to have more wells drilled while the lessee refused to do so. But we find the law stated therein to be equally applicable to the situation at hand.

It would have been a very simple matter for the parties to state that *at least* three wells were to be

drilled, if that was their intention. It could very well be that the lessee deliberately omitted such language with the intent to shield itself from an obligation to drill more than the number of wells specified in the lease, perhaps because of the speculative nature of the business.

In any event, the lease being construed against the lessee, and the typed language of Paragraph 20 prevailing over printed provisions to the extent that they are inconsistent, Adobe is restricted to operating the three existing wells only. In effect, the first sentence of Paragraph 20 varies the agreement from an exclusive grant of the gas and oil rights with unlimited (reasonable) drilling rights for so long as the lessee operates for gas and oil to an exclusive grant of the gas and oil rights with the right to drill and operate three wells only. "Three wells" does not have the same meaning as "at least three wells" or "not less than three wells." The parties having specified a "three well drilling program", that is what they are deemed to have intended.

Wherefore, we enter the following

## DECREE

Now, February 27, 1984, in accordance with the accompanying memorandum, it is hereby ordered and decreed that plaintiff, Adobe Oil & Gas Corporation, is not in violation of any of the terms or provisions of the lease dated February 2, 1981, between C.O.G. Energy Services, Inc., which assigned said lease to plaintiff, and Kenneth J. and Joyce A. Harchick, defendants, by drilling and completing three gas wells on the subject property during the primary term of said lease. Further, the terms of said lease limit plaintiff to the drilling and operation of a maximum of three wells and the drilling of a

fourth well on the property by plaintiff would constitute a breach of the lease.