**J.W.S. DELAVAU, INC., Appellee,**

v.

**EASTERN AMERICA TRANSPORT & WAREHOUSING, INC., Appellant.**

**J.W.S. Delavau, Inc., Appellant,**

v.

**Eastern America Transport & Warehousing, Inc., Appellee.**

Superior Court of Pennsylvania.

Argued June 12, 2002.

Filed Oct. 30, 2002.

---

Edward M. Koch, Philadelphia, for Eastern America Transport & Warehousing, Inc.

David J. Wolfsohn, Philadelphia, for J.W.S. Delavau, Inc.

Before: STEVENS, TAMILIA, and KELLY, JJ.

KELLY, J.

¶ 1 Appellant, Eastern America Transport and Warehousing, Inc. ("Eastern"), asks us to reverse the judgment entered in the Philadelphia County Court of Common Pleas, awarding Appellee, J.W.S. Delavau Company, Inc. ("Delavau"), monetary compensation for negligence, breach of contract, conversion, and delay damages. In its cross-appeal from the favorable judgment, Delavau asks us to determine whether the award of delay damages in its favor should be recalculated to include the period between the untimely death of the first trial judge and the second trial in the case. We hold Delavau is entitled to the delay damages it requests for the period in question. In all other respects, the judgment in favor of Delavau is affirmed. Accordingly, we affirm in part, reverse in part, and remand with instructions.

¶ 2 The relevant facts and procedural history are as follows: Delavau is in the business of manufacturing nutritional supplements. In the late 1980's, Delavau began storing goods, predominantly calcium carbonate, at the Harbor Warehouse (then known as the International Warehouse). On March 12, 1991, a fire occurred at the Harbor Warehouse, and Delavau began looking for another storage facility.

¶ 3 Eastern operated a public storage warehouse and approached Delavau to express an interest in warehousing Delavau's goods. In September 1991, Delavau's president met with Eastern's Chief Operation Officer ("COO") to discuss Delavau's needs. Delavau informed Eastern that, *inter alia,* the product was a nutritional supplement for human consumption and needed to be stored in a clean, dry space.

¶ 4 Although Eastern's warehouse was over fifty years old, and a general commodities warehouse as opposed to a food-grade warehouse, the space it offered Delavau was clean and dry. Delavau was satisfied that it could properly and safely store its product at Eastern's warehouse under the proffered conditions.

¶ 5 Eastern's COO and Delavau's president entered into negotiations and on October 31, 1991, they both signed a letter outlining the understanding of the deal. The letter set forth the price and other terms and conditions of the agreement, including: (1) any product Delavau requested *via* faxed order had to be released no later than the following morning; (2) Delavau's product had to be kept in an exclusive, designated area; (3) Eastern had to provide monthly activity reports; (4) Delavau was guaranteed access to its product at all times; (5) any damage to Delavau's goods had to be reported to Delavau immediately; (6) spray pesticides could not be used near Delavau's product; and (7) storage prices were guaranteed for two years.

¶ 6 Delavau moved what it considered to be good product from Harbor to Eastern. From 1991 through 1992, Delavau was consistently transporting product to and from Eastern with each shipment being evidenced by a warehouse receipt issued by Eastern and containing the pre-printed notation: "This receipt is valid only when signed by an officer of the company."

None of the receipts issued to Delavau was signed in the ordinary sense, but each did contain the computer-generated initials of the Eastern employee who prepared the warehouse receipt. In many instances the receipt contained the initials "L.W.", referring to Ms. Wilson, the warehouse administrator. Each receipt also contained certain terms and conditions, including one clause which sought to limit Eastern's liability for damages to 200 times the base storage rate, unless the depositor paid a premium of 2/10 of one percent per month on the excess valuation.

¶ 7 In June 1992, Delavau noticed that some of its product was returning from Eastern's warehouse with wet marks. Delavau conducted an inspection of the warehouse and found that Eastern's roof had suffered damage causing water leakage. Delavau subsequently received assurances from Eastern that the problem would be dealt with promptly. However, due to weather conditions and labor issues, Eastern was unable to fix the roof for several months. During that time, the roof's condition continued to deteriorate, causing a large amount of water to fall and pool on and around Delavau's goods. Eastern did not inform Delavau of the damage to its product. Instead, Eastern proceeded to house much of Delavau's product out of the exclusive area to prevent further damage to the product.

¶ 8 Delavau filed a claim with its insurance carrier, USF & G, for the water damage to its product. When USF & G's agent attempted to photograph the damaged product, Eastern turned him away. However, USF & G hired William Comly of Eastern Services and Recovery Company, an independent recovery agency, to complete an assessment and inventory of Delavau's product in Eastern's warehouse. In that inventory, the goods were divided into four categories: good, suspect, wet, and damaged.

¶ 9 After the inventory was complete, Eastern told Delavau to remove all of its product from the warehouse. Delavau refused, saying that it only wanted to remove the good product, and that it still intended to photograph the goods in the warehouse. Delavau was never permitted to photograph its goods. Therefore, in addition to refusing to remove its goods, Delavau stopped paying storage and transportation fees to Eastern.

¶ 10 Delavau filed suit against Eastern alleging negligence, beach of contract, and conversion. Eastern counterclaimed for transportation and unpaid storage charges. The case was tried before the Honorable Berel Caesar in May and June of 1997, and on June 30, 1997, Judge Caesar issued a verdict in favor of Delavau and in favor of Eastern on its counterclaim. Judge Caesar vacated the decision pending post-trial motions. October 9, 1997, while the motions were pending, Judge Caesar suddenly and accidentally died.

¶ 11 In February 2000, a new trial proceeded before the Honorable Joseph Papalini. Following consideration of the parties' proposed findings of fact and conclusions of law, on May 7, 2001, the trial court issued its verdict in favor of Delavau in the amount of $1,368,000.00 and in favor of Eastern on its counterclaim in the amount of $9,399.00, for a net award to Delavau of $1,358,601.00.[1]

¶ 12 Eastern filed post trial motions for judgment notwithstanding the verdict ("JNOV"), a new trial, or a new trial as to damages only, based upon assertions that Delavau had failed to sustain its burden of proof on damages and the trial court had erroneously reduced Eastern's counter-

---

1. On May 21, 2000 Eastern's warehouse and    its contents were completely destroyed by fire.

claim. Eastern also filed a motion to stay execution on the judgment. The court denied Eastern's motions and awarded Delavau limited delay damages on its judgment. The delay damages excluded the time period attributable to Judge Caesar's untimely passing (October 9, 1997 to February 14, 2000). This timely appeal and cross-appeal followed.

¶ 13 Eastern, in its appeal docketed at No. 3028 EDA 2001, raises the following issues for our review:

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR WHEN IT FAILED TO ENFORCE A PLAIN LIMITATION OF LIABILITY PROVISION CONSPICUOUSLY CONTAINED WITHIN WAREHOUSE RECEIPTS WHICH DELAVAU RECEIVED, WITHOUT OBJECTION, UPON DELIVERY OF EACH OF NUMEROUS SHIPMENTS OF GOODS TO EASTERN AMERICA'S WAREHOUSE OVER A 15 MONTH PERIOD?

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR WHEN IT CONCLUDED THAT DELAVAU HAD NOT ABANDONED ITS GOODS AT THE EASTERN AMERICA WAREHOUSE, WHERE DELAVAU EXERCISED NO RIGHTS OF POSSESSION OVER THE PROPERTY AND FAILED TO PAY TRANSPORTATION AND STORAGE CHARGES WHICH IT OWED?

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR WHEN IT PERMITTED DELAVAU TO DELEGATE ITS RESPONSIBILITY FOR STORAGE OF ITS GOODS UNDER "SANITARY CONDITIONS," AS REQUIRED UNDER THE FEDERAL FOOD AND DRUG ADMINISTRATION RULES AND REGULATIONS?

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR WHEN IT CONCLUDED THAT DELAVAU HAD SUSTAINED ITS BURDEN OF PROOF ON DAMAGES, DESPITE THE FACT THAT DELAVAU DID NOT TEST THE GOODS, DID NOT PRESENT EXPERT TESTIMONY, AND DID NOT PRESENT ANY OTHER COMPETENT EVIDENCE TO INDIVIDUATE DAMAGES?

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR BY IMPROPERLY REDUCING EASTERN AMERICA'S COUNTERCLAIM FOR STORAGE CHARGES WITHOUT LEGAL FOUNDATION?

(Eastern's Brief at 5).

¶ 14 Delavau, in its appeal docketed at No. 3124 EDA 2001, raises the following issue for our review:

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR WHEN IT REFUSED TO AWARD DELAY DAMAGES FOR THE FORTY–MONTH PERIOD (OCTOBER 9, 1997 TO FEBRUARY 14, 2000) BETWEEN THE DEATH OF THE FIRST TRIAL JUDGE, THE HONORABLE BEREL CAESAR, AND THE REASSIGNMENT OF THE CASE TO THE HONORABLE JOSEPH I. PAPALINI, THE SECOND TRIAL JUDGE, WHO ISSUED THE DECISION ON APPEAL, ON THE GROUND THAT SUCH DELAY "WAS IN NO WAY THE FAULT OF EITHER SIDE"?

(Delavau's Brief at 3).

¶ 15 Review of a trial court's decision to deny post-trial motions in the nature of a motion for JNOV and/or a new trial implicates the following standard and scope of review:

A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the

evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict.... Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact.... A JNOV should be entered only in a clear case.

Our review of the trial court's denial of a new trial is limited to determining whether the trial court acted capriciously, abused its discretion, or committed an error of law that controlled the outcome of the case. In making this determination, we must consider whether, viewing the evidence in the light most favorable to the verdict winner, a new trial would produce a different verdict. Consequently, if there is any support in the record for the trial court's decision to deny a new trial, that decision must be affirmed.

*Buckley v. Exodus Transit & Storage Corp.*, 744 A.2d 298, 304–5, (Pa.Super.1999) (internal citations omitted).

¶ 16 Appellate review of a contracts case requires this Court to determine whether the factual findings of the trial court are supported by competent evidence on the record, and whether the trial court committed an abuse of discretion. *Stonehedge Square Ltd. Partnership v. Movie Merchants, Inc.*, 454 Pa.Super. 468, 685 A.2d 1019, 1022 (1996), *affirmed*, 552 Pa. 412, 715 A.2d 1082 (1998). However, the trial court's conclusions of law are subject to plenary review. *Id.* Keeping in mind these principles, we consider the propriety of the trial court's decision to deny Eastern any post-trial relief.

¶ 17 In its first issue on appeal, Eastern argues that the parties did not intend to be bound solely by the terms of the October 31, 1991 letter. To the contrary, Eastern insists that the contract was formed upon delivery of the goods and issuance of the warehouse receipt. Eastern claims that its warehouse receipts contain a conspicuous limitation of liability provision, which constitutes a valid and binding term of the parties' "complete contract."

¶ 18 Eastern further asserts that Ms. Wilson, as "warehouse administrator", was the most appropriate person to sign the receipts, and that she therefore must be considered an officer of Eastern. Eastern also submits Ms. Wilson's computer-generated initials on the receipts comprise the necessary "signature" by an officer of the company to validate the warehouse receipts for purposes of rendering enforceable the limitation of liability provisions contained therein. In support of its contention, Eastern argues computer-generated initials must be deemed a "signature" in the ordinary sense because initials satisfy the signature requirements under the UCC, citing 13 Pa.C.S.A. § 1201 (defining signature as "any symbol executed or adopted by a party with present intention to authenticate a writing."). Eastern also directs our attention to the testimony of Mr. Lieb, an employee of Eastern, who stated that he believed Ms. Wilson was an officer of the company. Thus, Eastern insists the trial court erred in determining that the computer-generated initials were insufficient as a "signature" and that Ms. Wilson was not "an officer of the company," thereby precluding Eastern from invoking the liability limitation provisions contained in its warehouse receipts. Eastern construes the storage contract between the parties to include the terms

outlined in October 31, 1991 letter **and** the provisions contained on the warehouse receipts. To the extent the trial court refused to enforce the provisions contained in the warehouse receipts as part of the parties' agreement, Eastern concludes the court's decision should be reversed. We cannot agree.

¶ 19 In response, Delavau argues that the parties intended to be bound solely by the terms of the October 31, 1991 letter and not by the terms on the warehouse receipts. Delavau claims that the bailment contract was formed when the October 31, 1991 letter was signed, and not when its goods were delivered to Eastern's warehouse.

¶ 20 Delavau further asserts that even if the bailment contract was formed upon delivery of the goods, the terms on the warehouse receipt were not valid and binding, because Eastern failed to satisfy its own condition precedent; *i.e.* the receipts must be "**signed** by an **officer** of the company." Delavau contends the record supports the trial court's finding that Ms. Wilson was not an officer of Eastern. Delavau asserts that the phrase "officer of the company" must be construed against Eastern as the drafter of the receipts and therefore Eastern must prove that Ms. Wilson was an "officer of Eastern," not merely that she was the most appropriate person to sign the receipts.

¶ 21 Delavau also insists that computer-generated initials cannot be considered "signatures" in the plain and ordinary sense of the word. Delavau submits the trial court was correct in concluding that the UCC definition was inapplicable, because, *inter alia*, the phrase "**signed** by an officer of the company" was written by Eastern and is not a statutory term. Delavau construes the storage contract between the parties to include the terms outlined in October 31, 1991 letter **but not**

the provisions contained on the warehouse receipts. Delavau concludes we should affirm the trial court. We agree.

¶ 22 The proper interpretation of a contract is a question of law to be determined by the court in the first instance. *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983). When interpreting a contract, the goal is to determine the intent of the parties and effect must be given to all provisions in the contract. *Com., Dept. of Transp. v. Manor Mines, Inc.*, 523 Pa. 112, 119, 565 A.2d 428, 432 (1989). Importantly,

> Under ordinary contract law, contracts are enforceable when parties reach mutual agreement, exchange consideration and have set forth terms of their bargain with sufficient clarity. Additionally, an agreement is definite if it indicates that parties intended to make a contract and if there is an appropriate basis upon which a court can fashion a remedy. Moreover, when the language of the contract is clear and unequivocal, courts interpret the meaning by its content.

*Biddle v. Johnsonbaugh*, 444 Pa.Super. 450, 664 A.2d 159, 163 (1995). Also, once a contract has been formed, its terms may be modified only if both parties agree to the modification and the modification is founded upon valid consideration. *Corson v. Corson's Inc.*, 290 Pa.Super. 528, 434 A.2d 1269 (1981).

¶ 23 We further note, a "contract is not ambiguous merely because the parties do not agree on its construction." *RESPA of Pennsylvania, Inc. v. Skillman*, 768 A.2d 335, 340 (Pa.Super.2001). Rather,

> [c]ontractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This is not a question to be resolved in vacu-

um. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. We will not, however, distort the meaning of the language or resort to strained contrivance in order to find an ambiguity.

*Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 606, 735 A.2d 100, 106 (1999) (internal citations and quotations omitted).

¶ 24 When a term is ambiguous, courts may construe the term against the drafter of the document. *Central Transp., Inc. v. Board of Assessment Appeals of Cambria County*, 490 Pa. 486, 417 A.2d 144 (1980); *Molag, Inc. v. Climax Molybdenum Co.*, 431 Pa.Super. 569, 637 A.2d 322 (1994). Further, when applying a term as used in the UCC, it is most appropriate and indeed necessary to use the definition given in the UCC itself. *Triffin v. Dillabough*, 448 Pa.Super. 72, 670 A.2d 684, 689 (1996), *affirmed*, 552 Pa. 550, 716 A.2d 605 (1998). However, where an unambiguous term is not being used in the context of the UCC, it is most appropriate to apply the plain and ordinary meaning of the term, regardless of whether the term is also defined in the UCC. *Lebanon Coach Co. v. Carolina Cas. Ins. Co.*, 450 Pa.Super. 1, 675 A.2d 279, 283 (1996), *appeal denied*, 546 Pa. 695, 687 A.2d 378 (1997) (holding when interpreting contract, clear and unambiguous words must be given their plain and ordinary meaning).

¶ 25 Instantly, the October 31, 1991 letter was the end-product of substantial negotiations between the senior management of Eastern and Delavau and was signed both by Eastern's COO and Delavau's President. The signed letter set out the essential terms of the agreement and, until the current dispute arose, the parties acted in conformity with that agreement. *See Biddle, supra.* Thus, there is ample evidence in the record to support the trial court's finding that the parties intended to be bound by the terms of the October 31, 1991 letter, and that letter alone. *Id.* Therefore, the trial court did not abuse its discretion in finding that the parties intended to be bound by the October 31, 1991 letter.

¶ 26 Furthermore, Eastern is unable to point to anything in the record to indicate Delavau either consented to the limitation of liability contained in the warehouse receipt or that such a modification was supported by valid consideration. Thus, the terms of the warehouse receipt were not part of the contract between the parties, and Delavau cannot be subject to any liability provisions contained therein. *See Corson, supra.* It would demean the importance of the written agreement if the parties could find themselves bound by pre-printed terms and conditions on a warehouse receipt, especially after they had engaged in extensive negotiations and mutually agreed to terms, which did not include those contained in the warehouse receipt.[2] These facts alone are sufficient

---

2. Moreover, as the trial court noted, our sister courts which have dealt with similar issues have concluded that a bailee is not entitled to alter unilaterally a preexisting contractual agreement through a subsequently issued warehouse receipt which contains terms different from those contained in the original agreement. *See De Cecchis v. Evers*, 174 A.2d 463 (Del.Super.1961) (holding where contract previously formed, no modification could be made without consent of both parties and consideration and, therefore, liability provisions contained in subsequently issued warehouse receipt not binding); *Miller v. Newsweek, Inc.*, 660 F.Supp. 852 (D.Del.1987) (holding same); *Abend v. Haberman*, 281 A.D. 262, 119 N.Y.S.2d 488 (1953) (holding mailed receipt containing limitation of liability subsequent to the formation of contract not binding); *Grain Dealers Nat. Fire Ins. Co. v. Union*

to support the trial court's finding that Delavau was not bound by the liability-limiting terms on the warehouse receipts.

¶ 27 Even if the parties had not intended the October 31, 1991 letter to be the full and final understanding of the parties, Delavau was still not bound by the liability-limiting provisions of the warehouse receipts, as Eastern did not comply with the terms of those warehouse receipts. Here, the warehouse receipts contained a provision which required an "officer of the company" to "sign" the receipt. Nevertheless, the warehouse receipts contained only the computer-generated initials of Eastern's warehouse administrator, not the signature of a company official. Eastern's reliance on a single employee's belief that Ms. Wilson (the warehouse administrator) was an "officer" of Eastern is not sufficient for a finding of fact in favor of that belief. Eastern did not produce evidence or testimony from someone intimately familiar with its organizational structure to show Ms. Wilson was, in fact, an officer of the corporation. Eastern chose to use the phrase "officer of the company" and has the burden to show Ms. Wilson was indeed an officer of Eastern. It is not enough to opine that she was the most appropriate person to sign the receipts. *See Central Transp., Inc., supra; Molag, supra.* Therefore, the trial court properly found Ms. Wilson was not an officer of the company. *Id. See also Lebanon Coach Co., supra.*

¶ 28 Furthermore, as drafter of the receipts, Eastern had the opportunity to make clear whether the warehouse administrator's **computer-generated initials** would be a sufficient signature to validate the warehouse receipts. Computer-generated initials do not constitute a signa-

ture in the plain meaning of the word. *See* Collegiate Dictionary copyright © 2001 by Merriam–Webster, Inc. (stating, the word signature refers to "**a:** the act of signing one's name **b:** the name of a person **written with his or her own hand**.") (emphasis added). Ms. Wilson's computer generated initials did not meet the plain meaning of the word "signature." *See Lebanon Coach Co., supra.* Thus, the warehouse receipts issued by Eastern were not "signed" in accordance with its own terms. *Id.*

¶ 29 In the alternative, Eastern suggests that "course of performance" caused the terms on the receipts to be incorporated into the parties' contract, even if the terms were not originally part of the agreement. Specifically, Eastern claims Delavau received hundreds of warehouse receipts and did not complain, which establishes a course of performance having the effect of supplementing the contract with the additional terms on the receipt. In support of its position, Eastern cites *Kunststoffwerk Alfred Huber v. R.J. Dick, Inc.,* 621 F.2d 560, 564 n. 6 (3d Cir.1980) (stating courts have generally allowed course of performance to supplement and qualify terms of agreement) (citing J. White & R. Summers, Uniform Commercial Code § 3–3 (1972)), for the proposition that "course of performance" may modify an agreement. We disagree.

¶ 30 "Course of dealing" is a "sequence of previous conduct between the parties which is fairly regarded as establishing a common basis of understanding for interpreting their expressions and other conduct". 13 Pa.C.S.A. § 1205(a). "Course of performance" is a sequence of conduct between the parties subsequent to formation of the contract during perfor-

*Co.,* 159 Ohio St. 124, 111 N.E.2d 256 (1953) (holding warehouse receipt containing limita-

tion of liability mailed 20 days after delivery of stored goods not binding).

mance of the terms of the contract. *See* 1 White and Summers, Uniform Commercial Code § 3–3 (4th ed.). "Course of dealing" "may supplement or qualify terms of an agreement", 13 Pa.C.S.A. 1205(c), whereas "course of performance" may be used only to interpret a contract. *See Matthews v. Unisource Worldwide, Inc.*, 748 A.2d 219 (Pa.Super.2000), *appeal denied*, 568 Pa. 664, 795 A.2d 977 (2000) (citing *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978)); 13 Pa.C.S.A. § 2208(a).[3]

¶ 31 Here, the warehouse receipts were issued subsequent to formation and during performance of the contract. Therefore, any behavior with respect to the receipts can only be considered "course of performance" and not "course of dealing." Eastern does not provide any case law to suggest Pennsylvania courts have allowed "course of performance" to alter or supplement an agreement. To the contrary, Pennsylvania case law indicates "course of performance" can only be used to interpret, but not to supplement, the terms of an existing agreement. *See Matthews, supra.* Accordingly, Delavau's behavior with respect to the receipts cannot cause the liability-limiting term on the receipts to become part of the contract between the parties.[4]

¶ 32 Finally, Eastern argues if the liability-limiting term is part of the contract, it is enforceable due to Delavau's willful breach of the contract. As we have already concluded the liability-limiting provi-

sions of the warehouse receipts were not part of the parties' contract, we need not address this assertion.

¶ 33 In its next issue, Eastern argues Delavau abandoned its goods by failing to pay transportation and storage fees and by failing to remove its product when asked to do so. Eastern asserts Delavau cannot recover for damage to goods it has abandoned. Eastern concludes the trial court's decision on this matter should be reversed. We disagree.

¶ 34 We note:

Abandonment involves an intention to abandon, together with an act or omission to act by which such intention is apparently carried into effect. In determining whether one has abandoned his property or rights, the intention is the first and paramount object of inquiry, for there can be no abandonment without the intention to abandon. *Black's Law Dictionary*, West Publishing Co., Fifth Edition, p. 2 (1979). The intent to abandon is to be determined from all of the facts and circumstances of the case. *Russell v. Stratton*, 201 Pa. 277, 50 A. 975 (1902). The question of whether a particular act amounts to an abandonment is generally one of intention. *Eagan v. Nagle*, 378 Pa. 206, 106 A.2d 222 (1954). When deciding whether an object has been abandoned, we must consider the nature of the property, the acts and conduct of the parties in relation thereto and the other surrounding

---

3. Although "course of performance" is only mentioned in Article 2 of the UCC governing the sale of goods, we note that "course of performance" can also be relevant to determining the meaning of the contract in dispute. *See Atlantic Richfield Co. supra* at 376 n. 6, 390 A.2d at 741 n. 6 (noting parties' "course of performance" is always relevant to interpreting contract); 13 Pa.C.S.A. § 1103.

4. Even if "course of performance" could modify an agreement, the "course of performance" in this case does not rise to the level required to modify an agreement. Though not binding precedent, we recognize the soundness of the reasoning in *Willow Valley Manor v. Trouvailles, Inc.*, 977 F.Supp. 700, 704 (E.D.Pa.1997) (stating, "the mere repeated sending of a writing containing additional terms does not, without more, give rise to modification of the existing agreement").

circumstances. *Gilberton Contracting Co. v. Hook,* 255 F.Supp. 687 (E.D.Pa. 1966).

*Commonwealth v. Wetmore,* 301 Pa.Super. 370, 447 A.2d 1012, 1014 (1982).

¶ 35 In this case, Delavau's valuable business product was housed in Eastern's warehouse. At no time did Delavau ever directly communicate any intention to abandon its goods. Its mere failure to pay certain fees does not rise to an intent to abandon. *Id.* In fact, Delavau expressed a desire to remove part of the goods from Eastern's warehouse but was prevented from doing so by Eastern's insistence that Delavau remove the entire product from storage. Further, Delavau was not allowed to photograph the product in the warehouse, even though the parties' contract guaranteed Delavau access to its product at all times. Delavau's behavior did not indicate intent to abandon. *Id.* Thus, the trial court properly concluded Delavau did not intend to abandon its property in Eastern's warehouse, and Eastern is not entitled to relief on this basis.

¶ 36 Next, Eastern argues Delavau is legally obligated under FDA rules and regulations to store its goods under "sanitary conditions" and that such a responsibility cannot be delegated. Nevertheless, Eastern asserts the trial court allowed Delavau to delegate its responsibility for the storage of goods under "sanitary conditions" to Eastern. Eastern concludes it should not be held liable for damage caused by Delavau's failure to store its goods under "sanitary conditions" because Delavau was negligent *per se* for choosing to store its goods with Eastern in the first place. We disagree.

¶ 37 In the instant case, Eastern agreed to store Delavau's goods under dry, sanitary conditions. Eastern failed to remedy the problems in the warehouse that made the conditions wet and unsanitary. As Eastern had agreed to store Delavau's goods in a dry, sanitary area, Eastern breached its contract with Delavau by failing to do so. *See Biddle, supra.* The trial court appropriately found Eastern had breached the contract by failing to provide the agreed-upon dry, sanitary area for Delavau's goods. *See Stonehedge Square Ltd. Partnership, supra.* Moreover, the evidence shows the warehouse was clean and dry when the parties first entered into the agreement, and it was Eastern who failed to remedy the deficiencies in its storage facilities. Thus, the record belies Eastern's claim.

¶ 38 Next, Eastern argues that the record is not sufficient for Delavau to meet its burden of proof with respect to damages, because Delavau did not chemically test the product stored in Eastern's warehouse or provide expert testimony to show damages. Eastern asserts the trial court erred in its finding as a matter of fact that Easter denied Delavau the opportunity to test the product. Eastern concludes Delavau failed to produce competent evidence on which to base its claims for damages. We disagree.

¶ 39 We note:

Generally, under Pennsylvania law, damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences. Although the law does not command mathematical precision from the evidence in finding damages, sufficient facts must be introduced so that the court can arrive at an intelligent estimate without conjecture. Where the amount of damage can be fairly estimated from the evidence, the recovery will be sustained even though such amount cannot be determined with entire accu-

racy. It is only required that the proof afford a reasonable basis from which the fact-finder can calculate the plaintiff's loss.

*Molag, Inc., supra* at 324 (citation omitted). Where a party is particularly familiar with its property, it is competent to approximate the value of the property. *Silver v. Television City, Inc.,* 207 Pa.Super. 150, 215 A.2d 335, 339 (1965).

¶ 40 Here, Delavau is a major supplement manufacturer and has been involved in the manufacture and sale of calcium product for many years. Delavau is competent to approximate the value of the damaged product at Eastern's warehouse. *See id.* At trial, Delavau's Vice–President of Finance and Administration testified regarding financial calculations quantifying the value of Delavau's pallets of product stored in Eastern's warehouse. *See Molag, Inc., supra.* Also, the trial court appropriately found Eastern effectively prevented Delavau from obtaining samples of its product for the chemical testing that it now claims Delavau should have undertaken to prove its damages. Therefore, we conclude Delavau met its burden of providing competent evidence on which to base its claims for damages. *Id.*

¶ 41 In its fifth issue, Eastern asserts that it stored Delavau's product until the May 2000 fire and it is entitled to storage and transportation fees through May 2000, and not just until July 1, 1993. Eastern concludes the trial court erred in reducing Eastern's counterclaim for storage and transportation fees. We disagree.

¶ 42 A party that materially breaches a contract cannot be awarded compensation for damages resulting from the other party's subsequent refusal to perform its obligations under the contract. *Ott v. Buehler Lumber Co.,* 373 Pa.Super. 515, 541 A.2d 1143, 1145 (1998) (stating "The general rule is that a party who has

materially breached a contract may not complain if the other party refuses to perform his obligations under the contract." A party also may not insist upon performance of the contract when he himself is guilty of a material breach of the contract) (citations omitted).

¶ 43 Here, the October 31, 1991 letter/contract specifically stated: "We [Delavau] will have access to our [Delavau's] product at all times." By refusing to allow Delavau to photograph its product, Eastern prevented Delavau from exercising its contractual right to full access to its product. Thus, Eastern breached a term of its agreement with Delavau. *See id.* Furthermore by preventing Delavau from photographing its product, Eastern essentially prevented Delavau from removing its product, because removal before photographing would have permanently deprived Delavau of the opportunity to document the damage to its product while still in Eastern's warehouse. Moreover, Eastern had already breached the contract when it failed to maintain as clean and dry the area of its warehouse designated exclusively for Delavau's product; when it unilaterally moved Delavau's product from the designated area in abrogation of the express terms of the agreement, and did not notify Delavau of the removal; and when it failed to notify Delavau of the damage the leaking roof had caused to its product. Due to Eastern's own material breaches of the parties' agreement, the trial court correctly determined Eastern was not entitled to damages subsequent to June 1, 1993. *Id.*

¶ 44 In its cross appeal, Delavau argues Eastern did not make a qualifying offer of settlement pursuant to Pa.R.C.P. 238(a)(1). Further, Delavau submits it did not cause the delay of the second trial. Delavau concludes it is entitled to an

award for delay damages, including the period between October 9, 1997 and February 14, 2000, which is the time between Judge Caesar's untimely death and the second trial in this case. We agree.

¶ 45 The text of the Rule 238 states:

At the request of the plaintiff in an action seeking monetary relief for bodily injury, death or property damage, damages for delay **shall** be added to the amount of compensatory damages awarded against each defendant found to be liable to the plaintiff in the verdict of a jury, in the decision of the court in a nonjury trial ... and **shall** become part of the verdict, decision or award.

Pa.R.C.P. 238(a)(1) (emphasis added). Rule 238 mandates the imposition of delay damages for the period of time, as provided in the Rule, during which there has been no qualified offer of settlement proposed by the defendant, and the plaintiff did not cause the delay. *Id.* Moreover, the Rule provides no exception that applies when the delay cannot be attributed to either party. *King v. Southeastern Pennsylvania Transp. Authority*, 383 Pa.Super. 420, 557 A.2d 11 (1989) (*en banc*); *Miller v. Wise Business Forms, Inc.*, 381 Pa.Super. 236, 553 A.2d 443 (1989) (*en banc*). The defendant/appellee in *Miller* failed to make an adequate settlement offer prior to trial, and after receiving a verdict the plaintiff/appellant sought Rule 238 delay damages. The trial court acknowledged the agreement of the parties that neither party was responsible for the delay. Reasoning defendant/appellee should not bear the burden of paying for a delay he did not cause, the trial court denied delay damages. On appeal, this Court reversed the trial court's decision, holding the defendant/appellee was responsible for Rule 238 damages even though he did not cause the delay. *Id.* at 446–47.

¶ 46 In *King*, this Court had the opportunity to elaborate on the *Miller* decision. As in *Miller*, the defendant/appellant in *King* failed to make an adequate settlement offer prior to trial. After receiving a jury verdict, the plaintiff/appellee moved for Rule 238 delay damages. The trial court determined the cause of delay was the backlog in the court system, and not attributable to either party. Nevertheless, the trial court held Rule 238 requires the defendant/appellant to pay delay damages even though that party was not at fault. This Court affirmed, holding: "Where the defendant has not made an adequate settlement offer pursuant to Rule 238(b)(1) and the plaintiff has not caused the delay of the trial as noted in Rule 238(b)(2), there is no basis on which to deny the plaintiff an award of delay damages." *See King, supra* at 13 (internal quotations omitted). Likewise, we concluded "[t]he drafters of the new rule have **not** allowed for the exclusion of periods of delay not caused by either party." *See id.* (internal quotations omitted) (emphasis in original).

¶ 47 Here, it is undisputed that Eastern did not make a qualifying offer of settlement and that the delay, due to the sudden death of Judge Caesar, was not the fault of either party. *Id.* Nevertheless, the fact that the delay was not caused by Eastern does not relieve Eastern of liability for delay damages. *See id.; Miller, supra.* The language in Rule 238 is mandatory. It does not extend discretion to the trial court to exclude a period of time from the calculation of delay damages where the defendant was not at fault. *See* Pa.R.C.P. 238. Therefore the trial court erred when it excluded the time between October 9, 1997 and February 13, 2000 from the calculation of delay damages awarded to Delavau. *Id.* Consequently, we reverse and remand the matter to the trial court to recalculate delay damages in favor of Dela-

vau to include the period of October 9, 1997 and February 13, 2000.

¶ 48 For the foregoing reasons, we hold Delavau is entitled to delay damages for the time between the untimely death of the first trial judge and the second trial in the case. Accordingly, we affirm the judgment in favor of Delavau in all other respects, but reverse and remand for the recalculation of delay damages consistent with this opinion.

¶ 49 Judgment affirmed in part, reversed in part; case remanded with instructions. Jurisdiction is relinquished.

**In re J.D.W.M., A/K/A J.D.W.-M. Appellee.**