**LaBar Village Condominium Association, Inc. v. LaBar Village Community Association, Inc.**

100

C.P. of Monroe County, No. 10211 CIVIL 2009.

*Gregory D. Malaska*, for plaintiffs.
*Daniel P. Lyons*, for defendant.

HIGGINS, *J.*, March 11, 2013—Now before the court are the exceptions to the master's report and recommendation filed by the defendant, LaBar Village Community Association, Inc. ("defendant"). The plaintiffs in this suit are LaBar Village Condominium Association, Inc., LaBar Meadows Condominium Association, Inc., David Braithwaite, Barbara Braithwaite and Catherine Fordham (collectively, "plaintiffs").[1] This case concerns the interpretation of a declaration, recorded in 1990, which governs voting rights and member-fee assessments for a multi-phase planned community known as LaBar Village. The two plaintiff condominium associations, as well as Mr. and Mrs. Braithwaite and Ms. Fordham, have

_____

1. Important documents of record include: the transcripts of two hearings conducted by the special master (N.T. for July 12, 2012 and July 31, 2012) as well as their exhibits, the "1990 Declaration" attached to the original complaint as Exh. K, and the special master's report and recommendation (filed Sept. 10, 2012.)

certain representative voting rights on the community's board and are assessed fees pursuant to the declaration. In part, they ask the court to clarify the obligations of the parties.

In count I, the plaintiffs seek declaratory judgment on the meaning of the declaration's terms "general common area," "exclusive common area" and "neighborhood" for purposes of the fee assessment.

In count II, the plaintiffs also seek declaratory judgment that they are entitled to separate representation on the board of directors for each phase-neighborhood, pursuant to certain terms of the declaration.

In count IV, the plaintiffs claim that the defendant breached its fiduciary duty when it improperly designated (or failed to designate) the common areas, and assessed fees against the plaintiffs in contradiction of the terms of the declaration.

For counts III, V and VI neither party has filed exceptions to the special master's recommendations.[2] We summarize the procedural history as follows:

On October 30, 2009, the plaintiffs filed the instant complaint against the defendant.

On April 29, 2010, we ordered that the parties complete discovery by September 30, 2010. On December 14, 2010, we accepted a voluminous, stipulated record

---

2. A brief discussion of counts III, V and VI is provided in fn. 14, infra.

filed by the parties.

On January 13, 2011, the plaintiffs filed a motion for summary judgment. On April 5, 2011, we heard oral argument on the plaintiffs' motion. On July 14, 2011, we denied the plaintiffs motion for summary judgment.

On January 4, 2012, by stipulation of the parties, we appointed James F. Preston, Esq. as special master to issue a report and recommendation for the court. On February 12, 2012, in order to prepare his report and recommendation, the special master toured the property, accompanied by both parties' attorneys. On July 12 and July 31, 2012, the special master held hearings at which the parties presented evidence and, on August 8, 2012, the special master heard arguments. On September 10, 2012, the special master issued his report and recommendation.

On October 11, 2012, the defendant filed its exceptions to the report and recommendation. On October 15, 2012, the plaintiffs filed their response.[3]

On December 3, 2012, we heard arguments. We summarize the facts as follows:

In 1990, Charles Wilson recorded a declaration for a piece of property he was developing called LaBar Village.[4] The declaration for LaBar Village was signed by Mr. Wilson on behalf of LaBar Village Development Company.

---

3. As stated above, the plaintiffs did not file exceptions.
4. Previously, the property was governed by a trust agreement.

LaBar Village is a multi-phase planned community which was built up over time. Since 1990, the declaration has continuously governed the different phases of LaBar Village up until the present date.

The phases of the development were given names: Pine Valley, Turtle Cove, Duck Hollow, Sparrow Pointe, Meadows and Cedarwood. Meadows and Cedarwood are condominiums, while Pine Valley, Turtle Cove, Duck Hollow and Sparrow Pointe consist of townhomes. Meadows and Cedarwood have their own separate associations governed by the 'Master Association' which is the defendant. The boards of Meadows and Cedarwood, along with condominium unit owners David Braithwaite, Barbara Braithwaite and Catherine Fordham, are plaintiffs in the instant suit.

At LaBar Village's inception, and continuing for some time thereafter, Mr. Wilson essentially maintained all officer positions associated with the creation and management of LaBar Village. Specifically, we note that Mr. Wilson was the president and secretary of LaBar Village Development Co., the signator and 'Declarant' of the Declaration. (N.T. July 31, 2012, 2nd master's hearing, pg 371.) During his management of LaBar Village, Mr. Wilson sat on the board and appointed two other directors.

Under the terms of the declaration the declarant (in effect, Mr. Wilson) was to determine what was exclusive common area and general common area. All

neighborhoods would pay appropriate fees to maintain the general common area, while only specific neighborhoods would pay fees for the exclusive common area. Although necessary to determine the appropriate fees, the declarant never explicitly designated what areas were exclusive and general common area. Instead, the declarant assessed a flat percentage of LaBar village's total expenses on each neighborhood. These percentages were not tailored to each neighborhood's actual use or need

In 1997, the declarant rescinded control of the community, after having managed its budget and fee assessments for seven years.[5] LaBar Village's board of directors then maintained control of the budget and fee assessments until the current date. The declarant's appointed board members continued on the board until 2007.

In 2007, for the first time, an entirely owner-chosen board was elected. (N.T. July 12, 2012, 1st master's hearing, pg 235.) These directors unwittingly inherited the suspect budgeting practices of the former boards, believing the previous budgets to be properly prepared. Unbeknownst to them, these budget practices would be the focal point of a coming lawsuit.

In December of 2007, David Braithwaite agreed to serve

---

5. The plaintiffs presented exhibits demonstrating the board's budget allocations from 1992 until 2012. Pl.'s exh. 5 from 1st master's hearing. Later, we will discuss how the defendant relies on this exhibit for its argument and how the defendant focuses on the budget allocations between 1992 and 1996.

as a reserve study specialist in order to help the defendant's board plan for future financial needs. (N.T. July 12, 2012, 1st master's hearing, pg 98.) Upon review of the LaBar Village's budget, Mr. Braithwaite was concerned with certain charges assessed against condominium owners that he did not believe were for 'general common areas' under the terms of the declaration.[6] In September 2008, during the annual budget meeting, he raised his concern that certain expenses should be neighborhood-specific. After mentioning the issue "the room erupted in chaos." This chaos became the instant suit.

Prior to the suit, the defendant's board formed a committee and investigated their own governing documents. They found that the declarant had failed to provide common area designations. In an attempt to remedy the situation, the defendant instructed its committee to investigate what should be exclusive and general common area. The committee presented its reports and the board adopted what they thought was intuitively fair: if an area is used by you, you ought to pay for it. However, this principle was applied in a general way and, like the previous budgets, did not track each neighborhood's actual

---

6. Mr. Braithwaite testified at both special master's hearings. He demonstrated his careful examination of the LaBar Village's expenses and governing documents, as well as his considerable care and knowledge in employee management and budgeting. Previously, Mr. Braithwaite was the director of manufacturing and maintenance at Tobyhanna Army Depot where he supervised 3,000 employees with an annual budget over $100 million. (N.T. July 12, 2012, 1st master's hearing, pg 36.) He was used as a reserve study specialist by the defendant. In the report and recommendation, the special master found Mr. Braithwaite "credible and authoritative." R&R, findings of fact at 17.

use or need.[7]

Essentially, the defendant objects to three parts of the special master's report and recommendations ("R&R"): (a) the addition of new voting groups; (b) the designations of exclusive and general common area; and (c) the calculation of damages from its breach.[8]

For exception (1), the addition of new voting groups, the defendant argues that this contradicts the express terms of the declaration which says "if the declarant fails to establish voting groups, all units are assigned to one... voting group." [Exh. K attached to original complaint, 1990 declaration, article III, section 3(b).]

In regards to exceptions (2, 3), common area classifications, the defendant argues that the special master "abused his discretion and/or made a clear error of law" because his recommended classifications are contrary to the declaration, do not consider budgets prepared by the declarant between 1992 and 1996 and do not consider the custom and use of the community in the last twenty years.

Finally, for exception (4) the calculation of damages based on breach of fiduciary duty, the defendant believes the special master abused his discretion by relying on the testimony of David Braithwaite, which did not determine

---

7. The committee had a majority and minority report. The minority report was, in part, written by plaintiff Barbara Braithwaite.

8. The defendant entered four "exceptions." For purposes of discussion, we consolidate the defendant's second and third exceptions dealing with the designations of exclusive and general common area.

whether the proposed damages were calculated by the appropriate designations of the common areas, and, as an action in equity, inappropriately did not account for past underpayments by the plaintiffs.

The plaintiffs, in part, agree with the defendant that some of the common area designations in the R&R are inappropriate. Specifically, the plaintiffs agree that the community center and community parking lot are general common area, not exclusive common area. In addition, the sewer treatment plants, its infrastructure and roads are general common area. The plaintiffs disagree with the balance of the defendant's exceptions.

In Pennsylvania, a master's report and recommendation is to be given the fullest consideration. *Taper v. Taper*, 939 A.2d 969, 973-74 (Pa. Super. Ct. 2007). This is particularly true when it comes to the question of a witness' credibility, since the master has the opportunity to observe and assess the behavior and demeanor of the witness. *Id.* Nevertheless, a master's report is advisory only and the reviewing court is not bound by it and it does not come to the court with any preponderate weight or authority which must be overcome. *Rothrock v. Rothrock*, 765 A.2d 400, 404 (Pa. Super. 2000) (internal citation omitted).

Even when a declaration is not a contract, a court, where appropriate, may apply principles related to contract law when examining the declaration. *MetroClub Condo. Ass'n v. 201-59 N. Eighth St. Associates, L.P.*, 47 A.3d 137, 145 (Pa. Super. Ct. 2012) *appeal denied*, 57 A.3d 71 (Pa.

2012).

In the law of contracts, it is well-established that:

> The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself.... [I]n determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect.... [This court] will not interpret one provision of a contract in a manner which results in another portion being annulled.

*Lesko v. Frankford Hosp.-Bucks County*, 15 A.3d 337, 342 (Pa. 2011) (internal citation, quotation omitted).

Furthermore, "the intention of the parties at the time of contract governs and...such intent must be ascertained from the entire instrument." *Vernon Twp. Volunteer Fire Dept., Inc. v. Connor*, 855 A.2d 873, 879 (Pa. 2004); *see Buck Hill Falls Co. v. Clifford Press*, 791 A.2d 392, 397 (Pa. Super. Ct. 2002) (holding intent at time of formation governs).

In interpreting a contract, extrinsic evidence is limited:

> When a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence. Hence, where language is clear and

unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended.

*Lesko*, 15 A.3d at 342 (internal citation omitted, emphasis in original).

Even when the words of a document are unambiguous, the court must still consider the context in which they are written. *Id.* at 745. To this effect our Supreme Court has stated:

> We are not unmindful of the dangers of focusing only upon the words of the writing in interpreting an agreement. A court must be careful not to retire into that lawyer's Paradise where all words have a fixed, precisely ascertained meaning; where men may express their purposes, not only with accuracy, but with fulness (sic); and where, if the writer has been careful, a lawyer, having a document referred to him, may sit in his chair inspect the text, and answer all questions without raising his eyes.

*In re Breyer's Estate*, 379 A.2d 1305, 1309 fn. 5 (Pa. 1977) (internal citation and quotation omitted).

As such, the court may ascertain the intentions of the parties to a written agreement in light of: (1) their language; (2) the nature of their subject matter; (3) the apparent object or purpose of the parties; and (4) the circumstances or conditions surrounding their execution." *See Vernon Twp. Volunteer Fire Dept., Inc.*, 855 A.2d at 879 (holding

same for restrictive covenants).

'Course of performance' is a term of art which means "a sequence of conduct between the parties subsequent to formation of the contract during performance of the terms of the contract." *J.W.S. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc.*, 810 A.2d 672, 683-84 (Pa. Super. Ct. 2002). The parties' course of performance is always relevant in interpreting a writing. *Atl. Richfield Co. v. Razumic*, 390 A.2d 736, 741 fn. 6 (Pa. 1978). However, the "'course of performance' can only be used to interpret, but not to supplement, the terms of an existing agreement." *J.W.S. Delavau, Inc.*, 810 A.2d at 684.

When a contract fails to provide for a specific contingency, it is silent, not ambiguous. *Seven Springs Farm, Inc. v. Croker*, 748 A.2d 740, 744 (Pa. Super. Ct. 2000) *aff'd*, 801 A.2d 1212 (Pa. 2002). In remedying a contract's silence, the doctrine of necessary implication may be employed:

> In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

*Agrecycle, Inc. v. City of Pittsburgh*, 783 A.2d 863, 868 (Pa. Commw. Ct. 2001) (internal citation omitted).

However, the doctrine may be applied only in limited circumstances to prevent injustice where it is abundantly clear that the parties intended to be bound by the terms sought to be implied. *Id.*

Mere uncertainty as to the amount of damages will not bar a recovery where it is clear that damages were the certain result of the defendant's conduct. *Standard Pipeline Coating Co., Inc. v. Solomon & Teslovich, Inc.,* 496 A.2d 840, 846 (Pa. Super. Ct. 1985). Furthermore, damages do not have to be determined with mathematical precision, but only a reasonable degree of certainty. *Id.* We will now discuss the specific issues raised by the Defendant's exceptions.

### Designation of Exclusive and General Common Areas
### (Count I)

First, we consider whether the special master's recommended designations of exclusive and general common area are a proper interpretation of the declaration.

While the declaration does not specifically designate common areas in LaBar Village, Article I defines the terms exclusive and general common area:

Section 10. *"Common Area"* shall be an inclusive term referring to both General Common area and Exclusive Common area.

...

Section 14. *"Exclusive Common Area"* shall refer to that real and personal property which the Association now or hereafter owns or otherwise holds for the exclusive use and benefit of one or more, but less than all, Neighborhoods, as more particularly described in article II of this declaration.

...

Section 16. *"General Common Area"* shall mean all real and personal property which the Association now or hereafter owns or otherwise holds for the common use and enjoyment of all owners.

Article I also defines the groupings of unit owners for purposes of determining appropriate fees:

Section 22. *"Neighborhood"* shall refer to each separately developed residential area comprised of one o more housing types subject to this declaration, whether or not governed by an additional owners association, in which owners may have common interests other than those common to all Association Members. For example, and by way of illustration and not limitation, each condominium, townhome development, cluster home development, and single-family detached housing development may constitute a separate Neighborhood. In addition, each parcel of land intended for development as any of the above shall constitute a Neighborhood, subject to division into more than one Neighborhood upon development.

...

Section 23. *"Neighborhood Assessments"* shall mean assessments levied against the Units in a particular Neighborhood or Neighborhoods to fund Neighborhood Expenses, as more particularly described in Article X, Section 1 of this Declaration.

Section 24. *"Neighborhood Expenses"* shall mean and include the actual and estimated expenses incurred or anticipated to be incurred by the Association for the benefit of Owners of Unites within a particular Neighborhood or Neighborhoods. Which may include a reasonable reserve for capital repairs and replacements, all as may be specifically authorized from time to time by the Board of Directors and as more particularly authorized herein.

(1990 Declaration, exh. K attached to original complaint.)

During the special master's hearings, Charles Wilson testified that, when he was drafting the documents, he believed that whoever benefited from certain areas should pay for them. After reviewing the declaration's definitions plaintiff Braithwaite prepared joint exhibit 1.2, an aerial view of LaBar Village, with colored areas showing the plaintiffs' contentions as to what constituted exclusive common area and general common area. (J. exh. 1.2.)[9]

_____
9. Mr. Braithwaite prepared another map with the "defendant's View" of what constitutes exclusive and general common area. Because the map accurately reflects the defendant's contentions in this regard, the

The special master found joint exhibit 1.2 to accurately depict the declarant's intent.

Here, we think the declaration communicates the drafter's intent in its plain language. The declaration states that whatever property LaBar Village owns or holds "for the exclusive use and benefit of one or more, but less than all, Neighborhoods" is exclusive common area. Whatever it owns or holds "for the common use and enjoyment of all owners" is general common area. While the document is silent as to which areas are owned or held as exclusive and general common area, these simple terms employ the reader's common sense. The designations of exclusive and general common area are necessary to decide the continuing rights of the parties. Employing the doctrine of necessary implication, we must consider the drafter's intent and make a reasonable and just interpretation of the declaration to carry out that intent.

Here, the defendant argues that its budgets between 1992 and 1996 are helpful in determining what is general and exclusive common area. These are helpful, says the defendant, because the declarant was in control of the board during these years and, as the drafter, his intent is paramount in determining the proper interpretation of the declaration. In other words, the defendant claims this is a course of performance which shows the drafter's intent. However, it is not the declarant's subsequent intent which is at issue, but the intent at the time of execution. We agree

---

defendant did not prepare its own exhibit.

with the plaintiffs where they state: "this entire lawsuit is an interpretive exercise to determine if the past practice is valid...[the past practice] is the last thing that should be taken into consideration in determining how to allocate expenses moving forward." Pl.'s answer at 2. As has been admitted by the defendant, the declarant failed to follow the method outlined in the declaration for designating general and exclusive common area. The declarant's failure to properly provide for those designations renders the budgets it controlled from 1992 to 1996 suspect. This poor conduct warrants particular consideration where, as here, we do not have a negotiated agreement between parties. Instead, we have unilateral action in a non-negotiable setting. As such, in considering the declarant's failure to abide by the terms of the declaration, we afford the budgets from 1992 to 1996 little weight.

Here, the defendant's board realized the Declarant failed to properly designate common areas. To remedy this situation, the defendant's board designated common areas based on use. (N.T. July 12, 2012, 1st master's hearing pg 242.) For instance, condo unit owners have used a walking lane around the townhomes and so the board concluded all the condo unit owners must pay for that walking lane. This, apparently, also led the board to charge the condos for some of the landscaping within the townhome areas. Neither were individual contributions considered in determining the fee assessments, the defendants simply employed a flat percentage of each neighborhoods' estimated use. *See Id.* at 222. In contrast, plaintiff Braithwaite testified that,

as a condo owner, he did not feel he had a right to use the townhome areas. *Id.* at 113-116. He testified extensively as to what areas he thought were for the use of all or for specific neighborhoods. Mr. Braithwaite prepared the plaintiffs' colored map (J. exh. 1.2) in accordance with how he felt the areas ought to be designated. Of all the witnesses, the master specifically found that Mr. Braithwaite's testimony was credible. Accordingly, we afford his testimony special weight. While the witness was not entitled to draw legal conclusions, here, we think that his testimony is helpful to determine the intent of the parties.

Here, Village Drive is admitted by all to be the main road of LaBar Village. As such, it should be general common area because it is for the use and enjoyment of all owners. The unimproved land is simply a natural display which, having no one's privacy to violate, it is reasonable to infer that these are for everyone in LaBar Village to enjoy as they may. However, the improved land immediately around the townhomes are not for the use and enjoyment of the condominium owners. They are for the townhome owners. We think it fair to infer from the record that the townhome owners would not expect to see condominium owners using their lawn or landscaping. Neither are the loop roads for the use and enjoyment of all; no other person need drive on these roads to get in or out of LaBar Village except those who live off them. While the court must not ignore the purpose or context for which an agreement is drafted, neither is it a proper interpretation to ignore the defined terms of the document.

With the exception of the areas agreed upon by the parties, we think the colored map presented in joint exh. 1.2 is a common sense and fair presentation of the declarant's intended designations of exclusive and general common area.

Furthermore, we are not persuaded by the defendant's arguments over the double lane boulevard in Duck Hollow. The defendant contends that this was intended to be used as a secondary main road for LaBar Village and thus was not for the exclusive benefit of the neighborhood in Duck Hollow. Insofar as that goes, we think the defendant is correct that the declarant intended the road to, eventually, act as a secondary main road for LaBar Village. However, the defendant ignores the language of the declaration where it defines exclusive common area: "exclusive use and benefit of *one or more*, but less than all, Neighborhoods." Declaration, section 14 (emphasis added). In other words, an exclusive common area may be for the benefit of Duck Hollow and Sparrow Pointe, etc. but not for the other neighborhoods. We think it plain that the double lane boulevard would be for the use and benefit of Duck Hollow and whatever neighborhood which would be built to have access only through that boulevard. As such the double lane boulevard is, currently, only exclusive common area for Duck Hollow.

Finally, the defendant also raises specific objections to the classification of the "loop roads" in Turtle Cove and Duck Hollow. These roads connect to Village Drive in

two places, hence the "loop." No one but the townhome owners need drive on the loop roads to enter or exit LaBar Village. Thus, they are for the access of the townhomes that are situated on those roads. However, the defendant argues that, from the time of the original trust document before the declaration, an easement by implication was created for all the neighborhoods and so the loop roads could not be classified as exclusive common area. We think the defendant's argument is in apropos. The common law doctrine of easement by implication does not say much for the declarant's intent in the declaration. The declaration specifically considers exclusive and general common area expenses, which does not imply it considers that an easement by implication has arisen. While an easement by implication might dispose of access rights, the declaration is dealing with duties of maintenance specifically delegated in a writing. We also agree with the plaintiffs that there appears to be no basis for extending the alleged easement to the other neighborhoods. Consistent with our discussion above, we think the loop roads are exclusive common area to their respective townhome-neighborhoods.

## Voting Groups (Count II)

Next, we consider whether we ought to award declaratory judgment that, under the declaration, the plaintiffs are entitled to representation by multiple voting groups to elect members for the community's board of directors and, to this end, that the defendant is obligated to afford the plaintiffs elections.

Article III, Section 3(b) of the declaration provides:

*Voting Groups. The Declarant shall establish Voting Groups* for election of directors to the board in order to promote representation on the board of directors for various groups having dissimilar interest and to avoid a situation in which the voting members representing similar neighborhoods are able, due to the number of Units in such neighborhoods, to elect the entire board of Directors, excluding representation of others. Each Voting Group shall be entitled to elect the number of directors specific in article III, section 5 of the By-Laws. Any other members of the Board of Directors shall be elected at large by all Voting Members without regard to Voting Groups.

The declarant shall establish Voting Groups not later than the date of expiration of the Class "B" Control Period by filing with the Association and in the Office of the Recorder of Deeds for Monroe County, Pennsylvania, a Supplemental Declaration identifying each Voting Group and designating the Units within each group. Such designation may be amended from time to time by the Declarant, acting alone, at any time prior to the expiration of the Class "B" Control Period. Until such time as Voting Groups are established by the Declarant, or in *the event that the Declarant fails to establish Voting Groups, all Units shall be assigned to the same Voting Group.*

1990 declaration (emphasis added).

The declarant, LaBar Development Company,[10] never designated voting groups as required by the declaration. LaBar Village's directors are currently elected by a single group of the entire community, which fails to give individual neighborhoods effective or consistent representation on the board. (N.T. July 12, 2012, 1st master's hearing, pg. 130-33.)

The defendant argues that the unambiguous words quoted above clearly establish the drafter's intent that the defendant not be required to establish voting groups when the declarant has failed to do so. We are constrained to agree.

Here, the declaration goes on at length about the reasons why voting groups should be established, i.e. why a diverse board, consisting of representation by each neighborhood, is needed to prevent problems within the community. By the express language, it is patently obvious the drafter intended the declarant to designate voting groups and that this is what the drafter hoped would happen. We can only speculate that if the declarant had fully carried out its duty, much difficulty could have been avoided. Considering the continuing costs to the parties' common weal, the defendant might do well to find some legal means to carry out the spirit of the declaration today. However, this consideration does not make the words of the declaration any less clear.

---

10. Charles Wilson is the president and secretary of LaBar Development Company and he signed the declaration. Exh. K, declaration; *see* (N.T. July 12, 2012, master's hearing, pg. 76.)

Here, no surrounding circumstances at the time of execution throw a different light on the drafter's account of what happens should the declarant fail in his duty. The plain purpose of this subsection was to ensure representation on the community's board, either by multiple voting groups or by one voting group at the very least. The fact that the language of the declaration provides for alternatives evinces the drafter's intent that the document should govern those alternatives. The declaration states that, upon the declarant's failure to designate voting groups, the Units shall be consolidated in one voting group. Such is what happened here and it is fully consistent with the intent expressed in the declaration. If the drafter intended some other remedy for the declarant's failure, it would have been a simple matter to address that concern. For our part, we cannot contradict the letter of a writing in order to pursue its spirit.[11] Accordingly, we will not adopt the special master's recommendation for count II and we are constrained to find that the plaintiffs are not entitled to multiple voting groups under the declaration.

### Breach Of Fiduciary Duty, Improperly Assessed Fees (Count IV)

Now, we consider whether the defendant's improper assessment of fees resulted in $182,848 in damages to the plaintiffs. We note at the outset that the defendant does not

---

11. *See McVicker v. Dennison*, 45 Pa. 390, 391 (Pa. 1863) ("We are strongly inclined to believe the work was done in no good spirit, certainly not in what the judge assumed to be the spirit of the contract; but having been done according to the letter of the bargain, it should be paid for according to the letter.")

contest the master's finding that it breached its fiduciary duty to the plaintiffs.

The calculation of damages in this case is somewhat nebulous. Twenty three years ago, the declarant failed to record the designations of common areas which were necessary to calculate fees. Without having proper designations for the common areas, the defendant engaged in an *ad hoc* system for assessing fees against the plaintiffs. The defendant inherited a broken budgeting system, assumed that it was proper and proceeded with what little information it had. This budgeting system was in place for approximately eighteen years before it came to the attention of the plaintiffs. Full and complete records and an itemized budget were not kept over that time. If they had been, we suppose that this lawsuit might not have been necessary.

The plaintiffs, aware that they have been wronged but lacking the records and common area designations necessary for a very precise estimate, have relied on the defendant's own budgets. In what we think was a considerable showing of restraint, the plaintiffs altered their estimated figure during the master's hearings, focusing on the years that the declarant was no longer preparing the budget, i.e. 1997 and afterwards. This reduced the plaintiffs' estimated damages from $627,667 to $182,848. The plaintiffs limit their request for damages to 1997 and its following years. The defendant now argues that, using 1997 as a base year for what the plaintiffs were rightly

required to pay, we ought to calculate backwards and reduce that estimate by $67,794.57. We think the defendant's argument seeks more precision than the subject allows. The lack of reliability of the defendant's records is the cause of the plaintiffs' injury. plaintiff Braithwaite based his calculations on the shift in maintenance responsibility from the townhomes to the condo owners. (N.T. July 31, 2012, 2nd master's hearing, pg 344); pl.'s exh. 5. By picking 1997 as the year to calculate damages, the plaintiffs basically forgave the defendant for any damages that resulted before 1997. We neither are convinced that the defendant received any damages for the years of 1992-1996, neither do we think it makes sense to now use those years against the plaintiffs.

In the alternative, the defendant also argues that the master had insufficient evidence to conclude 1997 was based on proper designations of exclusive and general common area. The defendant asks us to order an assessment of past budgets based upon our determination of exclusive and general common area. However, that is precisely the breach of fiduciary duty which has caused the plaintiffs' damages. Essentially, having presented no testimony or evidence by which the defendant could counter its own budgets, the defendant now seeks another determination of damages by arguing its budgets are too unreliable. On the contrary, we think the budgets are reliable enough to assess the damages in this case. As we have said, the damage estimate is based upon the defendant's budgets in past years. We think it highly unlikely that a third party

could go back through the defendant's records and provide a better estimate of the evolving state of expenses at LaBar Village over the years. For instance, how much money worth of snow-plowing services Duck Hollow actually used in 1999. Instead, we think the determination of damages is reasonably certain under the circumstances.

Finally, the defendant argues that the master improperly estimated certain damages from insurance premiums charged to the plaintiffs. Specifically, the master included in the total damage estimate $37,500 in premiums charged to the plaintiffs.[12] First, the defendant objects to reliance upon the testimony of plaintiff Braithwaite, who is not an insurance agent. However, Mr. Braithwaite testified that his estimate was based on his experience insuring his home in the Meadows condominium. (N.T. July 31, 2012, 2nd master's hearing, pg 356.) We think the credible testimony of Mr. Braithwaite makes this a reasonable estimate. Thus, as far as this part of the defendant's argument goes, we do not see any merit in the defendant's contention.

Second, within his exception to the insurance damages, the defendant claims that the master improperly failed to account for the defendant's insurance payments on behalf of the condominium owners. Prior to the two evidentiary hearings, the defendant had an opportunity to develop testimony and gather other evidence on its payment of insurance premiums. However, the defendant failed to

12. I.e. $37,500 in insurance overcharges was included in the total estimate of $182,848.

do so. Neither did the defendant ask the master to allow additional time for the defendant to assess the value of those insurance payments. In plaintiff Braithwaite's testimony, he told the master he was unaware if the defendant had an all-risk insurance policy covering property around the condominium associations. (N.T. July 31, 2012, 2nd master's hearing, pg 356-57.) The defendant's property manager, Angela Croffut, gave testimony that the defendant obtained insurance for the parking areas, driveway and landscaping outside the plaintiffs' condominiums. (N.T. July 31, 2012, 2nd master's hearing, pg 393-94.) Ms. Croffut did not give any testimony as to the amount of those insurance payments. *See id.* The defendant claims that, since breach of a fiduciary duty is a claim in equity, the calculation of damages should have been off-set by the unspecified amount of insurance coverage that it provided for the plaintiffs. We disagree.

Here, the defendant claims a cost which it correctly points out was not accounted for in plaintiff Braithwaite's estimate. However, the defendant only presented testimony that there was such a cost; it presented no testimony as to what that cost is. If the defendant wanted to successfully raise its insurance payments as an offset to the plaintiffs' damages, it should have developed that issue at the special master's hearings. *See Gruver v. Gruver,* 2006 WL 5229650 (Pa. Com. Pl. Dec. 18, 2006) (denying exception to damage assessment of special master where party failed to provide estimate of fair market value in opposition to opposing party's estimate before the special

master). Now, when the evidentiary hearings are over, the defendant wants us to re-determine the damages because the defendant claims an unspecified amount of money was not accounted for. We decline to do so. As we stated above, the damage determination in this case was somewhat nebulous, but we think the master used sufficient facts to make a reasonable determination under the circumstances. Mathematical precision is not necessary. Furthermore, it seems obvious that there were significant damages to the plaintiffs which remain unaccounted for. We will not act 'in equity' to effectively ignore these unknown damages, while granting the defendant's own request for unknown damages.

## ORDER

And now, March 11, 2013, after consideration of the parties' briefs and following argument on December 3, 2012, regarding the defendant's exceptions to the special master's report and recommendation, and no party having filed exceptions to the special master's recommendations for counts III, V and VI, we hereby order as follows:

1. We adopt the master's report and recommendation except as otherwise noted below.

2. The defendant's second and third exceptions to the special master's recommendation for count I regarding the designation of exclusive and general common area are denied in part and granted in part. We adopt the special master's recommendation for count I and modify the recommendation as follows:

The community center and its parking lot along with the sewer treatment plant, its related infrastructure and the sewer plant access road shall be designated as general common area and maintained at the expense of all neighborhoods in LaBar Village.

3. The defendant's exception to the special master's recommendation for count II is granted. The declaration does not require the defendant to establish multiple voting groups and the single voting group is consistent with the language of the declaration.

4. The special master's recommendation for count III is adopted. Count III is dismissed.

5. The defendant's exception to the special master's recommendation for count IV is denied. The master's recommendation for count IV is adopted. The defendant is ordered to credit the plaintiffs' fee assessments in the amount of $182,848.00.

6. The special master's recommendation for counts V and VI are adopted. The defendant is hereby ordered to credit the plaintiffs' fee assessments in the amount of 1/3 of the defendant's total attorney's fees for this case.

7. The court retains jurisdiction over all questions arising regarding the community plan, until that plan is recorded, as well as questions arising from the neighborhood budgets.