531 A.2d 815

Commonwealth of Pennsylvania, Department of Transportation, Petitioner *v.* Stavro N. Semanderes, trading as Odyssey Contracting Company, Respondent.

Stavro N. Semanderes, t/a Odyssey Contracting Company, Petitioner *v.* Commonwealth of Pennsylvania, Department of Transportation, Respondent.

Submitted on briefs April 21, 1987, to Judges CRAIG and DOYLE, and Senior Judge BARBIERI, sitting as a panel of three.

*John J. Buchy, Jr.,* Assistant Counsel, with him, *Spencer A. Manthorpe,* Chief Counsel, and *Henry G. Barr,* General Counsel, for petitioner/respondent, Commonwealth of Pennsylvania.

*Susan A. Yohe, Strassburger, McKenna, Gutnick &amp; Potter,* for respondent/petitioner, Stavro N. Semanderes, trading as Odyssey Contracting Company.

OPINION BY JUDGE DOYLE, September 24, 1987:

The Commonwealth of Pennsylvania, Department of Transportation (DOT) and Stavro N. Semanderes, t/a Odyssey Contracting Company (Odyssey), cross-appeal from an order of the Board of Claims (Board) awarding Odyssey $30,615.77 for bridge repairs. We affirm the decision of the Board.

The underlying facts found by the Board in this case are not in dispute. In June 1982, DOT and Odyssey entered into a contract for repair work to the Memorial Bridge in Connellsville, Pennsylvania. The initial total contract price was $294,392.50, which amount included $86,355 for Item 2090-0502 (Item) entitled "Concrete Bridge Deck Repair, Special." Under this Item, Odyssey was to repair 4,545 square feet of the bridge at a cost of $19 per square foot by removing existing con-

crete from areas outlined by DOT inspectors, cleaning the holes with compressed air, and filling them with a quick setting material.

Paragraph 3(b) of the Item provided in full:

(b) Preparation of Surface.

The limits of repair areas will be determined and delineated by the engineer. The contractor shall outline the delineated areas with a ¾ inch deep saw cut.

During the removal of *deteriorated* concrete should it be found that the area of *deteriorated* concrete extends beyond the initial saw-cut peripheries, new saw-cuts for repair limits shall be made.

The concrete shall be removed to a depth sufficient to provide a minimum ¾-inch clearance around all reinforcement bars in the top mat.

During the removal of *deteriorated* concrete the sound concrete surrounding the perimeter of the repair area shall be slightly undercut as shown in the attached sketch.

Exposed reinforcement bars shall be sandblasted or wire brushed to remove rust and/or corrosion. All portions of damaged or heavily corroded reinforcement bars shall be removed and replaced in kind by satisfactorily splicing to the remaining reinforcement bars.

All removal areas shall be blown clear with oil-free compressed air and protected against any contaminates detrimental to the bond of the patching material. (Emphasis added).

Odyssey began working on the bridge deck on September 27, 1982. In accordance with DOT's interpretation of the contract at that time, Odyssey removed concrete to a minimum depth of ¾-inch below the top mat

of reinforcement bars (rebars)[1] in every instance, regardless of whether the concrete below the top mat of rebars was sound or deteriorated. On September 30, however, after consultation with DOT's inspector in charge of the bridge contract, Odyssey began to remove concrete only down to the top mat of rebars, and would remove it to a minimum depth of ¾-inch *below* the top mat of the rebars only if the bond between the top bar and concrete was broken or if the concrete was deteriorated below the bar. This continued until October 14.

On October 15, however, a different DOT representative informed Odyssey that the contract required Odyssey to remove all concrete to a minimum depth of ¾-inch below the top mat of rebars, regardless of deterioration, and if deterioration extended to a depth greater than ¾-inch, then the deteriorated concrete also had to be removed. For the remainder of all repair work performed, Odyssey complied with DOT's interpretation of the contract.

Between October 1 and October 14, Odyssey performed 1,049.2 square feet of bridge repair work consistent with its interpretation of the contract. From October 15 until November 9, it completed the remaining bid quantity of 3,495.8 square feet in accordance with DOT's interpretation. In addition, at DOT's request, Odyssey performed 2,109.9 square feet of repair work in excess of bid quantity in a manner consistent with DOT's interpretation of the contract, and it sent a letter to DOT on November 15 requesting an increase of $6.57 per square foot for the additional work, making the unit price $25.57 per square foot for that segment of the work. On February 18, 1983, approximately two

---

[1] Reinforcement bars are metal rods laid in a mesh formation and embedded in the concrete beneath the surface of a bridge deck. (Brief for Respondent and Cross-Petitioner, p. 2).

months after all bridge deck repair work was completed, DOT authorized payment of $25.57 per square foot on all repair work in excess of the contract quantity of 4,545 square feet.

DOT ultimately paid Odyssey the following amounts: 1) $11.18 per square foot for 1000.4 square feet of work performed prior to October 15, 1982;[2] 2) $19 per square foot for the remaining 3,495.8 square feet under the contract; and 3) $25.57 per square foot for the 2,109.9 square feet of work in excess of the contract quantity.

Odyssey commenced this suit before the Board, seeking to recover costs for what it contends was excessive concrete removal from September 27 through September 30 and from October 15 through November 23, 1982, the periods during which it performed the repairs in accordance with DOT's interpretation of the contract. The Board concluded that the contract language as to depth of removal was ambiguous, and applied the *contra proferentem* rule of construction against DOT, the drafter of the contract. Construing the contract under Odyssey's interpretation, the Board held that DOT modified its terms by requiring Odyssey to remove all concrete to a minimum depth of ¾-inch below the top mat of rebars, irrespective of deterioration, instead of to the top mat of rebars, and awarded Odyssey $30,615.77 plus interest. DOT appeals to this Court, and Odyssey cross-appeals as to damages only.

In reviewing orders of the Board of Claims, this Court's scope of review is limited to determining whether an order of the Board is in accordance with law and

---

[2] The Board found that DOT paid only this amount because DOT took the position that, although all the work was not in conformity with the contract, it was reasonably acceptable and $11.18 per square foot reflected an appropriate adjustment in the contract price applied to the area that DOT contended was acceptable.

whether its findings of fact are supported by substantial evidence. *Larry Armbruster and Sons, Inc. v. State Public School Building Authority,* 95 Pa. Commonwealth Ct. 310, 505 A.2d 395 (1986). Contract interpretation and construction is a question of law uniquely within the province of the court. *Department of Transportation v. Bracken Construction Co.,* 72 Pa. Commonwealth Ct. 620, 457 A.2d 995 (1983).

DOT argues that since the contract was clear and unambiguous as to removal of concrete, the Board erred by construing the contract under Odyssey's interpretation. We cannot agree.

It is axiomatic that when the words of a contract are clear and free from ambiguity, the intent of the parties is to be determined solely from the express language of the agreement. *Robert F. Felte, Inc. v. White,* 451 Pa. 137, 302 A.2d 347 (1973). However, it is equally fundamental that when a contract is ambiguous, it is appropriate to resort to extrinsic evidence in determining the intent of the parties. *Bracken Construction Co.* A contract is ambiguous if it is reasonably susceptible to more than one construction, its meaning is obscure due to indefinite expression, or it has a double meaning. *State Highway and Bridge Authority v. E.J. Albrecht Co.,* 59 Pa. Commonwealth Ct. 246, 430 A.2d 328 (1981).

DOT argues that the Item is unambiguous by quoting one part of Paragraph 3(b): "The concrete shall be removed to a depth sufficient to provide a minimum ¾-inch clearance around all reinforcement bars in the top mat." Contract language, however, is not to be analyzed in isolation; rather, the whole contract must be considered. *Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736 (1978). Numerous paragraphs of the Item, both within paragraph 3(b) and surrounding it, refer to removal of *deteriorated* concrete, and the Item therefore could reasonably be read to require removal to a

¾-inch depth below the rebars only when there was deterioration. We thus agree with the Board that the contract was ambiguous.[3]

When a contract is ambiguous, it is undisputed that the rule of *contra proferentem* requires the language to be construed against the drafter, *i.e.*, DOT, and in favor of the other party if the latter's interpretation is reasonable. *See, e.g., Central Transportation, Inc. v. Board of Assessment Appeals of Cambria County*, 490 Pa. 486, 417 A.2d 144 (1980).

Here, Odyssey's interpretation of the contract as requiring removal of concrete to a minimum depth of ¾-inch below the top mat of rebars only if the concrete was deteriorated or the bond between the top bar and the concrete was broken, in light of the surrounding provisions in the Item, was clearly reasonable. The Board, therefore, correctly construed the contract and found that DOT modified it by requiring removal of the concrete regardless of deterioration.

Accordingly, we will affirm the Board insofar as it held that DOT modified the contract by requiring Od-

---

[3] In particular, we note that the subparagraphs immediately preceding and following that portion of Paragraph 3(b) quoted by DOT refer to deteriorated concrete:

> During the removal of *deteriorated* concrete should it be found that the area of *deteriorated* concrete extends beyond the initial saw-cut peripheries, new saw cuts for repair limits shall be made.
>
> . . . .
>
> During the removal of *deteriorated* concrete the sound concrete surrounding the perimeter of the repair area shall be slightly undercut as shown in the attached sketch. (Emphasis added).

Because we hold that the Board was correct in determining that the contract was ambiguous *on its face*, we do not need to decide whether the Board also properly relied upon the actions of the parties in determining whether the contract was ambiguous.

yssey to remove more concrete than was required by the contract, during the period of September 27 through September 30 and from October 15 through November 23, 1982.

As to the amount of compensation awarded to Odyssey due to DOT's modification of the contract, we will also affirm the Board, and reject Odyssey's cross-appeal. The Board awarded Odyssey $30,615.77, plus interest, ruling that it was entitled to the following: 1) $19 per square foot for the 1,049.2 square feet of work performed by Odyssey between October 1 and October 14 consistent with its own interpretation of the contract; 2) $25.57 per square foot for the remaining 3,495.8 square feet of work under the contract performed after DOT's modification of the contract; and 3) $25.57 per square foot for the 2,109.9 square feet of work in excess of the contract quantity performed by Odyssey in a manner identical to the 3,495.8 square feet of work done after DOT's modification. In total, the Board ruled that Odyssey should have been paid $163,272.55 for bridge deck work performed, rather than $132,656.78.

For the 3,495.8 square feet of work under the contract performed after October 14, and for the 2,109.9 square feet of work performed in excess of the contract quantity, Odyssey contends that it was entitled to compensation of $28.04 per square foot, or roughly $54,000 more than DOT actually paid. We disagree.

The Board held that Odyssey was entitled to $25.57 per square foot for the work performed in excess of the contract quantity because this is what Odyssey itself requested from DOT in its letter of November 15. This constituted an admission on the part of Odyssey, which it cannot now attempt to disavow. Likewise, the Board determined that Odyssey was entitled to $25.57 per square foot for the work performed under the contract after October 15, since it was essentially the same type

of work as Odyssey performed in excess of the contract quantity. We hold that Odyssey's admission was substantial evidence on which the Board could base its decision.

The Board specifically found to be not credible Odyssey's contention that the increase requested in the November 15 letter was only to cover increased costs for working in cold weather, not all costs of performing the work. Credibility determinations are the exclusive province of the Board, and we will not disturb them on appeal. *Department of Public Welfare v. Divine Providence Hospital,* 101 Pa. Commonwealth Ct. 248, 516 A.2d 82 (1986).

Affirmed.

ORDER

NOW, September 24, 1987, the order of the Board of Claims, Docket No. 883 dated May 9, 1986, is affirmed.