# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Township of Lower Yoder, A Political Subdivision of Cambria County, Pennsylvania | : : : : | |
| v. | : : | No. 932 C.D. 2016 Argued: April 6, 2017 |
| Borough of Westmont, A Political Subdivision of Cambria County, Pennsylvania, <br> Appellant | : : : : | |

**BEFORE:**   **HONORABLE RENÉE COHN JUBELIRER,** Judge
**HONORABLE PATRICIA A. McCULLOUGH,** Judge
**HONORABLE ANNE E. COVEY,** Judge

<u>OPINION NOT REPORTED</u>

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                    **FILED:  May 31, 2017**

Borough of Westmont (Borough) appeals from an Order of the Court of Common Pleas of Cambria County (trial court) that dismissed Borough's Exceptions to and denied reconsideration of an earlier order, which found a 1962 Article of Agreement (Agreement) between Borough and Township of Lower Yoder (Township) inapplicable to a current dispute over allocation of costs to replace portions of a sanitary sewer system the two municipalities share.  The trial court found the Agreement applied only to routine maintenance and repairs of two presently existing interceptor lines, not to the proposed replacement project.  For the reasons set forth herein, we affirm.

## I. Background

On September 10, 1962, Borough and Township, which are neighboring municipalities in Cambria County, entered into the Agreement that established each party's rights and responsibilities in relation to two interceptor lines that would service both municipalities. (Article of Agreement, R.R. at 12-14.) The Agreement provided that the parties would contribute equally towards the construction cost of the Stackhouse Park interceptor, and Borough and Township would contribute 65 percent and 35 percent, respectively, towards the construction cost of the St. Clair Run interceptor. (Id., R.R. at 13.)

The Agreement further provided, in pertinent part, that: (a) "cost of maintenance" after construction would be borne by Township; (b) Borough "shall perpetually have free and uninterrupted right, use and privilege of and access to and through" the interceptors; and (c) Township will "maintain" the interceptors and "keep the same in good repair," with it being understood that the interceptors, after construction, shall be "owned and maintained" by Township. (Id., R.R. at 13-14.) The Agreement also provided that Borough's cash payment for construction costs would be "disproportionate to future development and future use" of the interceptors, and in consideration of the payment, Borough was "relieved of future maintenance costs." (Id., R.R. at 12.)

Pursuant to the Agreement, Borough contributed $105,000 towards construction costs. (R.R. at 247, 306-08.) Also consistent with the Agreement, Township has assumed all costs associated with maintaining and repairing the lines over the last six decades and has not asked for any assistance from Borough, until now. (R.R. at 248.)

In June 2014, Township approached Borough seeking financial assistance to replace the two interceptor lines. (R.R. at 60-61.) Replacement of the lines is required to address infiltration and inflow (I&I) problems, which resulted in the parties each entering into consent decrees with the Pennsylvania Department of Environmental Protection (DEP). (R.R. 37-59, 123-24.) The existing system is largely comprised of terra cotta pipes, which are susceptible to leaks and breakage and are not cost effective to repair. (R.R. at 75, 123-24.) The average life expectancy of such a system is only 50 years.[1] (R.R. at 140). Engineers opined routine maintenance and repairs are no longer feasible. (R.R. at 75, 138, 140-41.) Instead, they have recommended replacement of the interceptors, using plastic or PVC pipe, in order to bring the system into compliance with DEP standards. (R.R. at 130, 140-41.) The estimated cost of such a project is $4 million. (R.R. at 139.)

Despite being responsible for approximately two-thirds of the flow on the interceptor lines, (R.R. at 25, 127), Borough refuses to contribute towards the replacement costs, citing the Agreement. (R.R. at 67-70.) After trying unsuccessfully to negotiate with Borough, Township filed a Complaint for Declaratory Judgment on May 22, 2015. The Complaint asked trial court to find the Agreement did not apply to replacement of the existing lines and/or to reform the Agreement to require Borough to pay its fair share of the replacement costs. (Compl. ¶¶ 18-19.) In the alternative, Township asked trial court to determine that the Agreement has concluded and ended so the municipalities can negotiate a new

---

[1] There was evidence that the interceptors were completely replaced after the 1977 Johnstown Flood. (R.R. at 89, 143.) However, a professional engineer who testified as an expert for Township stated that based upon inspection, only portions were replaced. (R.R. at 144-48.) A crew leader of Township's maintenance department for the last 43 years also testified only four portions were replaced. (R.R. at 240.)

agreement that would address construction and usage of replacement lines. (Id. ¶ 20.) Borough filed an Answer to the Complaint on August 14, 2015, wherein it continued to assert that the Agreement controlled.

A full-day hearing was held on October 23, 2015, at which a number of witnesses testified for Township, including two experts, one a professional engineer and one an executive director of a local municipal authority with 42 years' experience, who testified about the need to completely replace the existing lines instead of merely repairing them. Two Township supervisors and its crew leader in the maintenance department also testified as to the Township's past efforts to repair and maintain the lines. Borough did not present any witnesses but did introduce minutes from various council meetings held before the Agreement was entered, which it claims shows that its obligations were intended to be limited to the one-time contribution towards construction costs.

On October 27, 2015, trial court issued an Opinion and Order, finding the 1962 Agreement applies only to the presently existing interceptor lines, not to their future replacement. (R.R. at 426.) Trial court further denied Township's request to reform the Agreement and, instead, suggested the parties enter into a new agreement regarding the proposed lines. (R.R. at 427.)

On November 5, 2015, Borough filed Exceptions to trial court's Order, requesting it reconsider its decision and arguing the Agreement clearly and unambiguously controls. Following briefing and argument, trial court issued an Order dated May 16, 2016, dismissing the exceptions, denying Borough's motion

4

for reconsideration, and affirming its prior Order. (R.R. at 455.) It is from this Order that Borough appeals.[2]

## II.    Analysis

This appeal involves interpretation of a contract that Borough and Township entered into more than a half century ago concerning construction of two sanitary sewer interceptor lines that now need to be replaced. Both parties argue the contract clearly and unambiguously supports their respective positions. On the one hand, Borough argues the Agreement plainly requires Township to maintain the lines, including replacement, which is consistent with the Township's status as an owner. On the other hand, Township argues the Agreement is silent as to replacement, which is not the equivalent of maintenance, a promise it agreed to and has kept for greater than sixty years, and that contract principles limit the Agreement's application to a reasonable time period, which ends with the life of the existing lines. Trial court concluded that the Agreement mentions only that Township agreed to **maintain** the lines, and **maintenance** does not encompass wholesale **replacement** of the lines.

Because this matter involves an issue of contract interpretation, we begin with a brief overview of legal principles that apply. Interpretation of the Agreement is guided by well-established contract law principles, which the Pennsylvania Supreme Court has summarized as follows:

---

[2] Construction of a contract is a question of law subject to a *de novo* standard of review. Wyeth Pharmaceuticals, Inc. v. Borough of West Chester, 126 A.3d 1055, 1061 n.5 (Pa. Cmwlth. 2015). On questions of law, this Court's scope of review is plenary. Id. Further, a trial court's factual findings are entitled to deference so long as they are supported by evidence of record. Id.

5

> When a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence. Hence, where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as **manifestly expressed**, rather than as, perhaps, silently intended.
>
> * * *
>
> The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself. In determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect . . . . An act or event designated in a contract will not be construed as a condition unless that clearly appears to be the intention of the parties.

Lesko v. Frankford Hosp. – Bucks Cnty., 15 A.3d 337, 342 (Pa. 2011) (citations and quotations omitted) (emphasis in original). Stated another way, when the words of a contract are clear and free from ambiguity, the intent of the parties is to be determined solely from the express language of the agreement. Dep't of Transp. v. Semanderes, 531 A.2d 815, 817 (Pa. Cmwlth. 1987). A contract is considered ambiguous if it is "reasonably susceptible to more than one construction, its meaning is obscure due to indefinite expression, or it has double meaning." Id.

Thus, we begin our analysis with an examination of the Agreement's plain language. The Agreement provides that: (a) "cost of **maintenance** of said interceptors after construction shall thereafter be borne by [Township]"; (b) "[Borough] shall perpetually have free and uninterrupted right, use and privilege of and access to and through said sanitary sewage interceptors for the transmission of sanitary sewage from portions of [Borough] to connections with the sanitary sewers of the City of Johnstown and/or Municipal Authority of the City of

6

Johnstown"; and (c) "[Township] will hereafter **maintain** said sanitary sewage interceptors **and keep the same in good repair**, it being hereby understood by the parties hereto that the said interceptors, after construction, shall be owned and **maintained** by [Township]." (R.R. at 13-14) (emphasis added). The Agreement also provides that Borough's cash payment for construction costs "will be disproportionate to future development and future use" of the interceptors, and in consideration of the payment, Borough "is to be relieved of future **maintenance** costs." (R.R. at 12) (emphasis added).

The plain language of the Agreement provides that Township will only **maintain** the two interceptor lines once they are installed. We agree with trial court that an agreement to **maintain** the lines does not equate to an agreement to **replace** those lines when they reach the end of their useful life. To "maintain" means "[t]o continue (something)," such as "[t]o continue in possession," or "[t]o care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." Black's Law Dictionary 1039 (9th ed. 2009). See also Webster's Third New International Dictionary 1362 (2002) (defining "maintain" as "to keep in a state of repair, efficiency, or validity: preserve from failure or decline"). Maintenance may be a form of repair but is less than full replacement.

This view is consistent with our treatment of maintenance projects and reconstruction or replacement projects under the Prevailing Wage Act, Act of August 15, 1961, P.L. 987, as amended, 43 P.S. §§ 165-1—165-17. Under the Prevailing Wage Act, "maintenance work" is defined as "the **repair of existing facilities** when the size, type or extent of such facilities is not thereby changed or increased." Section 2(3) of the Prevailing Wage Act, 43 P.S. § 165-2(3) (emphasis

7

added). Maintenance work is exempt from the definition of "public work," which includes "construction, reconstruction, demolition, alteration and/or repair work other than maintenance work." 43 P.S. § 165-2(5). Our Supreme Court has found that "maintenance work" is a "**lesser** or **minor** form of 'repair.'" Borough of Youngwood v. Pa. Prevailing Wage Appeals Bd., 947 A.2d 724, 732 (Pa. 2008) (emphasis in original). So has our Court. See Borough of Schuylkill Haven v. Prevailing Wage Appeals Bd., 6 A.3d 580, 584 (Pa. Cmwlth. 2010) (finding extent of manhole project, in both scope and cost, rendered it repair work not mere maintenance); Borough of Ebensburg v. Pa. Prevailing Wage Appeals Bd., 893 A.2d 181, 183 (Pa. Cmwlth. 2006) (finding complete removal and replacement of sidewalks was reconstruction work not maintenance work); Kulzer Roofing, Inc. v. Dep't of Labor and Indus., 450 A.2d 259, 261 (Pa. Cmwlth. 1982) (finding reroofing project constituted repair not maintenance). Although not dispositive, we nonetheless find these cases and the reasoning therein persuasive.

Based upon contract interpretation principles, we agree with trial court that the 1962 Agreement between Borough and Township that requires Township to maintain the interceptor lines does not apply to wholesale replacement of the existing system.[3] We, therefore, affirm.

_____

**RENÉE COHN JUBELIRER,** Judge

---

[3] Because we find the Agreement inapplicable to replacement of interceptor lines, we need not address the other issues raised in Borough's Concise Statement of Errors Complained of on Appeal.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Township of Lower Yoder, A :
Political Subdivision of Cambria :
County, Pennsylvania :
  :
          v. : No. 932 C.D. 2016
  :
Borough of Westmont, A Political :
Subdivision of Cambria County, :
Pennsylvania, :
             Appellant :


## O R D E R


**NOW**, May 31, 2017, the Order of the Court of Common Pleas of Cambria County, in the above-captioned matter, is **AFFIRMED.**


_____
**RENÉE COHN JUBELIRER,** Judge